O’Connor, J.
{¶ 1} Appellant, Michael Arnold, appeals his conviction for raping his four-year-old daughter, M.A. Arnold argues that statements that M.A. made to social worker Kerri Marshall at the Center for Child and Family Advocacy at Nationwide Children’s Hospital (“CCFA”) were admitted contrary to his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. The court of appeals affirmed Arnold’s conviction, holding that Marshall did not act as an agent of the police when she questioned M.A. and that M.A.’s statements during the interview were nontestimonial.
{¶ 2} In interviewing M.A. at the CCFA, Marshall occupied dual capacities: she was both a forensic interviewer collecting information for use by the police and a medical interviewer eliciting information necessary for diagnosis and treatment. We hold that statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause. Thus, we affirm the judgment of the court of appeals to the extent that M.A.’s statements to Marshall for the purpose of medical treatment and diagnosis were properly admitted. We further hold that statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are *292 testimonial and are inadmissible pursuant to the Confrontation Clause. We agree with Arnold that the trial court erred in admitting the forensic statements made by M.A. to Marshall and reverse the court of appeals insofar as it held that these forensic statements were admissible. However, because the court of appeals did not consider whether the admission of M.A.’s forensic statement to Marshall was harmless, we remand this case to the court of appeals to consider this issue.
Relevant Background
{¶ 3} In December 2005, Arnold and Wendy Otto lived together in Hilliard, Ohio, with their two young children. Otto testified that upon awakening one night, she discovered that Arnold and their four-year-old daughter, M.A., were locked in a bedroom. Otto demanded that Arnold unlock the door, and when he did, she observed that his boxer shorts were halfway off. Otto also observed that M.A.’s underwear was around her ankles. She suspected sexual abuse, demanded that Arnold leave the premises, and called 9-1-1. Arnold left immediately. By the time paramedics arrived, many police officers were present. M.A. told firefighter-paramedic Charles Fritz that she had been touched in her private area.
{¶ 4} Paramedics took Otto and M.A. to Nationwide Children’s Hospital, where evidence for a rape kit was collected. While at the hospital, Otto was advised to take M.A. to the CCFA the next day. The record is unclear whether this advice came from the police, paramedics, hospital personnel, or some other source. At some point that night, M.A. was released.
{¶ 5} The next morning, Otto took M.A. to the CCFA. The CCFA is part of Children’s Hospital and is located across the street from the main hospital. At the CCFA, Marshall, a Nationwide Children’s Hospital employee, interviewed M.A. M.A.’s responses to Marshall’s questions indicated that she had been sexually abused. This interview is at the heart of Arnold’s Confrontation Clause claim.
{¶ 6} The interview yielded a variety of relevant information. For example, M.A. stated that Arnold’s “pee-pee” went inside her “pee-pee” and that Arnold’s mouth touched her “pee-pee.” These statements were necessary for M.A.’s medical evaluation and treatment. But M.A. also answered questions that related to the ongoing investigation. For example, in response to Marshall’s questions, M.A. stated that Arnold closed and locked the bedroom door before raping her and that Arnold removed her underwear.
{¶ 7} After the interview with Marshall, M.A. was physically examined by a pediatric nurse practitioner, Gail Horner, a hospital employee who worked in the CCFA. Horner found two abrasions to M.A.’s hymen, which she concluded had *293 been caused by acute trauma, likely from penetration, within the previous 24 to 72 hours. Horner testified that the abrasions were “diagnostic” of sexual abuse.
{¶ 8} Based on this and other information, including Otto’s testimony, Arnold was indicted on two counts of rape in violation of R.C. 2907.02. The first count charged rape by vaginal intercourse; the second charged rape by cunnilingus.
{¶ 9} At trial, the court determined that M.A. was unavailable to testify. After watching the DVD recording of M.A.’s interview with Marshall, the court determined that the statements had been made for the purpose of medical diagnosis and were admissible hearsay under Evid.R. 803(4). The court also determined that the statements were not barred by the Confrontation Clause. Accordingly, the DVD was played for the jury.
{¶ 10} The jury found Arnold guilty of rape by vaginal intercourse, but not guilty of rape by cunnilingus. R.C. 2907.02. Arnold was sentenced to life in prison.
{¶ 11} On appeal, the Tenth District affirmed Arnold’s conviction. State v. Arnold, Franklin App. No. 07AP-789, 2008-Ohio-3471, 2008 WL 2698885. We accepted Arnold’s discretionary appeal to determine whether, in a criminal prosecution, the out-of-court statements made by a child to an interviewer employed by a child-advocacy center violates the right to confront witnesses provided by the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. State v. Arnold, 120 Ohio St.3d 1452, 2008-Ohio-6813, 898 N.E.2d 967.
Analysis

Confrontation Clause

{¶ 12} “The Sixth Amendment’s Confrontation Clause provides that, ‘[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.’ We have held that this bedrock procedural guarantee applies to both federal and state prosecutions. Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).” Crawford v. Washington (2004), 541 U.S. 36, 42,124 S.Ct. 1354,158 L.Ed.2d 177. “Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment.” State v. Self (1990), 56 Ohio St.3d 73, 79, 564 N.E.2d 446.
{¶ 13} In Crawford, the Supreme Court of the United States considered whether the introduction of a hearsay statement admissible under state law violated a defendant’s Sixth Amendment right to confront the witnesses against him. The court held that out-of-court statements violate the Sixth Amendment when they are testimonial and the defendant has had no opportunity to cross-examine the declarant. 541 U.S. at 68,124 S.Ct. 1354,158 L.Ed.2d 177. See also State v. Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶ 21-26. The *294 court did not comprehensively define “testimonial” but stated that the core class of testimonial statements includes statements “ ‘that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.’ ” Crawford, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, quoting Brief of Amicus Curiae National Association of Criminal Defense Lawyers 3. Accord State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus. The court emphasized that the objective-witness test was but one of many possible ways to determine whether a statement is testimonial, and it expressly stated, “We leave for another day any effort to spell out a comprehensive definition of ‘testimonial.’ ” Crawford, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177.
{¶ 14} Two years later, in Davis v. Washington (2006), 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224, the court considered whether a caller’s responses to a dispatcher’s interrogation during a 9-1-1 telephone conversation were testimonial when the caller failed to appear to testify at trial. The court stated (1) that the statements described the events as they were happening, as opposed to explaining events that had happened in the past, (2) that any reasonable listener would conclude that the statements were made in the face of an ongoing emergency, (3) that the interrogation was objectively necessary to resolve the ongoing emergency, and (4) that the interrogation was informal because it was conducted over the phone and the answers were provided frantically while in an unsafe environment. Id. at 827. The court concluded that the circumstances surrounding the interrogation “objectively indicate [that] its primary purpose was to enable police assistance to meet an ongoing emergency. [The caller] simply was not acting as a witness; she was not testifying.” (Emphasis sic.) Id. at 828. Accordingly, the court concluded that the caller’s hearsay statements were not testimonial and, therefore, that they were not barred by the Sixth Amendment. Id. at 829.
{¶ 15} In Davis, the court also considered a second case in which a domestic-violence complainant did not appear at trial. Id. at 819-820. The police officer who interviewed the victim at the scene of the incident and who witnessed her complete and sign an affidavit concerning the abuse testified at trial in order to authenticate the affidavit. Id. at 820. The court determined (1) that the interrogation sought to determine what had happened, not what was happening, (2) that there was no ongoing emergency, (3) that the interrogation was not needed to resolve an emergency, and (4) that the interrogation was “formal enough” that it was conducted in a room separate from the complainant’s husband. Id. at 830. The court concluded that “[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly criminal past conduct — as, indeed, the testifying officer expressly acknowledged.” Id. at 829. Accordingly, the court concluded that the hearsay evidence was *295 testimonial and, therefore, that it was barred by the Sixth Amendment. Id. at 834.
{¶ 16} The court held that “[statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.” Id. at 822. Accord Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, paragraph one of the syllabus.
Stahl, Muttart, and Siler
{¶ 17} In Stahl, this court considered whether hearsay statements by a rape victim to a nurse practitioner during a medical examination at a hospital DOVE[1] unit were admissible when the victim was not available to testify at trial. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 1. The defendant argued that the statements violated his Sixth Amendment right to confront witnesses. Id. at ¶ 1, 9. This court distinguished Davis, stating: “They involve statements made to law-enforcement officers, while the statement at issue here covers one made to a medical professional at a medical facility for the primary purpose of receiving proper medical treatment and not investigating past events related to criminal prosecution.” (Emphasis sic.) Id. at ¶ 25. We concluded that the primary purpose of the examination was to receive medical treatment, not to investigate past events, applied the objective-witness test outlined in Crawford, and held that the challenged statements were nontestimonial. Id. at ¶ 47, 48.
{¶ 18} In State v. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, a child victim of sexual abuse was interviewed by a social worker at a child-advocacy center. Id., ¶ 14-15. As in the case before us now, the social worker interviewed the child before she was examined by a doctor. Id., ¶ 15. During the interview, the child disclosed to the social worker that her father had put his penis in her mouth and had “ ‘put his pee-pee in her pee-pee.’ ” Id., ¶ 16. The child also disclosed that similar conduct had happened “ ‘a whole bunch of times.’ ” Id. We held that the child’s statements were nontestimonial because “[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under Crawford.” Id., ¶ 63. This is true because statements for medical diagnosis and treatment “are not even remotely related to the evils that the Confrontation Clause was designed to avoid.” Id.
*296 {¶ 19} In Siler, we considered whether statements made by a child to a sheriffs deputy in the course of a police interrogation were testimonial. Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 2. We concluded that “the statements made to the deputy sheriff were testimonial because the circumstances objectively indicate that no ongoing emergency existed and that the primary purpose of the police interrogation was to establish past events potentially relevant to a later criminal prosecution.” Id. We held that courts in Ohio should apply the primary-purpose test set forth in Davis to determine “whether a child declarant’s statement made in the course of police interrogation is testimonial or nontestimonial.” Id. at paragraph one of the syllabus, citing Davis, 547 U.S. at 821-822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

Other State Supreme Comi Decisions

{¶ 20} Since Crawford, many state supreme courts have considered whether statements made by children during interviews at child-advocacy centers, or their functional equivalent, are testimonial and whether statements by child victims of sexual abuse for medical diagnosis and treatment are testimonial.
{¶ 21} We recognize that a number of those decisions held that statements by child-sexual-abuse victims at child-advocacy centers or their functional equivalent are testimonial and, therefore, inadmissible pursuant to the Confrontation Clause and Crawford when the defendant has no opportunity to cross-examine the victim at trial. See, e.g., State v. Contreras (Fla.2008), 979 So.2d 896; State v. Hooper (2007), 145 Idaho 139, 176 P.3d 911; In re Rolandis G. (2008), 232 Ill.2d 13, 327 Ill.Dec. 479, 902 N.E.2d 600; State v. Bentley (Iowa 2007), 739 N.W.2d 296; State v. Henderson (2007), 284 Kan. 267, 160 P.3d 776; State v. Snowden (2005), 385 Md. 64, 867 A.2d 314; State v. Justus (Mo.2006), 205 S.W.3d 872; State v. Blue, 2006 ND 134, 717 N.W.2d 558. But in each of these cases, the interviews were conducted solely for forensic purposes. The situation we are presented with in this case is distinct from those considered in the above-cited cases. Here we are asked to determine whether statements that contain distinct forensic and medical diagnostic information. and were made to a social worker during one interview implicate the Confrontation Clause. For example, in Contreras, the Florida Supreme Court held that a statement taken by the coordinator of a “child protection team” (“CPT”) was testimonial. Id. at 905. The interview was conducted and videotaped at a shelter for victims of domestic violence, and a police officer was connected electronically to the CPT coordinator in order to suggest questions. Id. There was no evidence that the child received medical treatment based on the interview. The court held that “the primary, if not the sole, purpose of the CPT interview was to investigate whether the crime of child sexual abuse had occurred, and to establish facts potentially relevant to a later criminal prosecution.” Id.
*297 {¶ 22} Similarly, the Illinois Supreme Court excluded statements made in a forensic interview when there was “absolutely no indication that * * * [the] interview * * * was conducted, to a substantial degree, for treatment rather than investigative purposes.” In re Rolandis G., 232 Ill.2d at 33, 327 Ill.Dec. 479, 902 N.E.2d 600. In that case, after stating that an older child forced him to perform fellatio, a six-year-old was taken to a child-advocacy center and was interviewed by a child advocate. Id. at 19. The interview was video recorded and observed by a detective through a one-way mirror. Id. As with Contreras, there was no indication that the child received a medical evaluation or treatment based on the interview. The Illinois Supreme Court concluded that “the interview took place at the behest of the police so that a more detailed account of the alleged sexual abuse could be obtained by a trained interviewer and memorialized on videotape” and held that the child’s statements were testimonial. Id. at 32.
{¶ 23} In Hooper, the Idaho Supreme Court excluded statements in a video-recorded forensic interview taken at a Sexual Trauma Abuse Response Center (“STAR”). 145 Idaho at 141,176 P.3d 911. In that case, a child was taken to the STAR center after her mother discovered the child and her father locked in the bathroom and suspected sexual abuse. Id. at 140. Upon arrival at the STAR center, the child met with a doctor and the doctor conducted a sexual-abuse examination. Id. at 141. After the medical examination, a forensic interviewer conducted a video-recorded interview with the child, which a detective observed via a closed-circuit system. Id. Because the interview occurred after the child met with and was examined by the physician, the subsequent interview served a forensic, not a medical or treatment-oriented, purpose.
{¶ 24} In the same vein, the Kansas Supreme Court held that a child’s statements during an interview conducted by a detective and a social worker, both members of the Exploited and Missing Children Unit, were testimonial. Henderson, 284 Kan. at 294, 160 P.3d 776. In Henderson, a mother took her three-year-old daughter to a medical clinic after noticing discharge from the child’s vagina and after the child complained that her “potty place” hurt. Id. at 269. Test results revealed that the child had gonorrhea. Id. After learning about the test results, the detective and social worker interviewed the child, who disclosed that her mother’s boyfriend had “touched her ‘potty in a bad way.’ ” Id. at 270. This interview was video and audio recorded. Id. Again, there is no indication that the child received additional medical treatment based on the interview.
{¶ 25} These cases that stand for the proposition that the admission of statements obtained during interviews at CACs or their functional equivalents result in violations of the Confrontation Clause when the declarant is unavailable *298 at trial arise from scenarios in which the statements at issue were solely for forensic purposes, rather than for ameliorative or therapeutic ones.
{¶ 26} In the latter category, our sister courts hold that statements made by child-sexual-abuse victims for the purpose of medical diagnosis and treatment are not testimonial and, therefore, do not implicate the Confrontation Clause even if they are used subsequently by the state in a prosecution. Seely v. State (2008), 373 Ark. 141, 282 S.W.3d 778 (holding that a child’s statements about abuse to a social worker at a children’s hospital before the child was examined by a doctor were nontestimonial); State v. Arroyo (2007), 284 Conn. 597, 935 A.2d 975 (holding that statements made to a social worker were nontestimonial because the primary purpose of the interview was to provide medical assistance to the child); State v. Krasky (Minn.2007), 736 N.W.2d 636 (holding that a child’s statements to a nurse alleging sexual abuse were nontestimonial because the nurse’s primary purpose was to assess and protect the child’s health and welfare); State v. Spencer, 339 Mont. 227, 2007 MT 245, 169 P.3d 384 (holding that statements to a counselor regarding sexual abuse were nontestimonial); People v. Vigil (Colo. 2006), 127 P.3d 916 (holding that responses to questions by a doctor as part of a sexual-assault examination were nontestimonial); Commonwealth v. DeOliveira (2006), 447 Mass. 56, 849 N.E.2d 218 (holding that statements to a physician were made for the purposes of medical evaluation and treatment and were not testimonial); Hobgood v. State (Miss.2006), 926 So.2d 847 (holding that a child’s description of sexual abuse to his doctor was not given for the purpose of prosecuting the accused and was not testimonial); State v. Vaught (2004), 268 Neb. 316, 682 N.W.2d 284 (holding that a child’s statements to an emergency-room physician identifying the perpetrator of sexual assault were nontestimonial).
{¶ 27} With this background in mind, we turn to whether M.A.’s statements to Marshall were testimonial.
{¶ 28} Pursuant to Stahl, Muttart, and Siler, to determine whether M.A.’s statements to Marshall were testimonial, we must identify the primary purpose of the statements. Statements made for the purpose of medical diagnosis and treatment are nontestimonial. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 63. However, statements made to agents of the police for the primary purpose of forensic investigation are testimonial. Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at ¶ 2.

Child-Advocacy Centers and the CCFA

{¶ 29} The objective of a child-advocacy center like the CCFA is neither exclusively medical diagnosis and treatment nor solely forensic investigation. “ ‘The purpose of a Children’s Advocacy Center is to provide a comprehensive, culturally competent, multidisciplinary response to allegations of child abuse in a dedicated, child friendly setting.’ ” Nancy Chandler, Children’s Advocacy Cen *299 ters: Making a Difference One Child at a Time (2006), 28 Hamline J.Pub.L. & Policy 315, quoting National Children’s Alliance, Accreditation Guidelines for Children’s Advocacy Centers (2004) 5.
{¶ 30} “Prior to the development of the Children’s Advocacy Center model, ‘traditional child abuse investigations often subject(ed) the child to multiple interviews.’ ” Id. at 332, quoting Lisa Snell, Child Advocacy Centers: One Stop on the Road to Performance-Based Child Protection (June 2003) 1. A child-advocacy center’s “ ‘number one goal’ ” is to reduce trauma to a child-abuse victim by coordinating the interview to include professionals from multiple agencies, which, in turn, can reduce the number of interviews needed and improve the quality of the investigation, the diagnosis, and the recommendation for treatment. Id. at 323. Additionally, “ ‘[t]hey help children avoid the trauma of repeating their story at various stops along the legal and judicial path.’ ” Id. These interdisciplinary teams often include law-enforcement professionals, prosecutors, medical and mental-health personnel, and child advocates. Id. at 324.
{¶ 31} At the CCFA, Marshall, a social worker employed by Nationwide Children’s Hospital, interviews children who are suspected victims of physical or sexual abuse. The purpose of the interview is to gather as much information as possible. The interview is both recorded on a DVD and transmitted to another room via closed-circuit television. Typically, a nurse practitioner or doctor, a children’s services caseworker, and a law-enforcement representative watch the interview from a separate room. Marshall does not inform the child that the team members are watching the interview, but does tell him or her that he or she will be examined by a doctor or nurse after the interview.
{¶ 32} After Marshall interviews the child, she meets with the doctor or nurse practitioner who will perform the medical examination to review the child’s statements. The nurse or doctor conducts the appropriate medical examination based on the child’s statements during the interview. The nurse or doctor relies on information obtained during Marshall’s interview to determine what examination and tests are needed. For example, information regarding the identity of the perpetrator, the age of the perpetrator, the type of abuse alleged, and the time frame of the abuse allows the doctor or nurse to determine whether to test the child for sexually transmitted infections.

The Interviewer’s Dual Capacity

{¶ 33} Child-advocacy centers are unique. Multidisciplinary teams cooperate so that the child is interviewed only once and will not have to retell the story multiple times. Most members of the team retain their autonomy. Neither police officers nor medical personnel become agents of the other. However, to ensure that the child victim goes through only one interview, the interviewer must elicit as much information from the child as possible in a single interview *300 and must gather the information needed by each team member. Thus, the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim. The interviewer acts as an agent of each member of the multidisciplinary team.
1
{¶ 34} Certainly, some of the statements that M.A. made to Marshall primarily served a forensic or investigative purpose. Those statements include M.A.’s assertion that Arnold shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold’s boxer shorts, of him removing them, and of what Arnold’s “pee-pee” looked like; and her statement that Arnold removed her underwear. These statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state’s investigation. Marshall effectively acted as an agent of the police for the purpose of obtaining these statements.
{¶ 35} Because Marshall acted as an agent of the police in obtaining these statements, pursuant to Davis and Siler, we must employ the primary-purpose test to determine whether the primary purpose of the interrogation was “ ‘to enable police assistance to meet an ongoing emergency.’ ” Siler, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, at paragraph one of the syllabus, quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224. We hold that it was not. First, the statements involved a description of past events. The alleged abuse occurred the previous evening, and the questioning specifically attempted to obtain a description of the abuse. Second, a reasonable observer would not perceive an ongoing emergency at the time of questioning. The patient had been discharged from the hospital the previous evening. At oral argument, counsel conceded that no medical emergency existed at the time of Marshall’s interview. Third, the questioning was not objectively necessary to resolve an emergency because there was no ongoing emergency. Finally, the interview was rather formal, more akin to the videotaped, planned interview of Crawford than to the frantic 9-1-1 call or the sequestered but spur-of-the-moment interview recounted in Davis.
{¶ 36} The primary purpose of that portion of the interview was not to meet an ongoing emergency but, rather, to further the state’s forensic investigation. Thus, these statements were testimonial in nature and their admission without a prior opportunity for cross-examination is prohibited by the Confrontation Clause. Crawford, 541 U.S. at 68,124 S.Ct. 1354,158 L.Ed.2d 177.
*301 2
{¶ 37} Although the statements obtained during Marshall’s interview of M.A. that related primarily to the state’s forensic investigation are testimonial and thus inadmissible pursuant to Crawford, other statements provided information that was necessary to diagnose and medically treat M.A. The history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary. For example, the nurse practitioner conducts a “head to toe” examination of all children, but only examines the genital area of patients who disclose sexual abuse. That portion of the exam is to identify any trauma or injury sustained during the alleged abuse.
{¶ 38} M.A.’s statements that described the acts that Arnold performed, including that Arnold touched her “pee-pee,” that Arnold’s “pee-pee” went inside her “pee-pee,” that Arnold’s “pee-pee” touched her “butt,” that Arnold’s hand touched her “pee-pee,” and that Arnold’s mouth touched her “pee-pee” were thus necessary for the proper medical diagnosis and treatment of M.A.
{¶ 39} In his dissent, Justice Pfeifer states that he is troubled by our conclusion that these statements were medically necessary because M.A. had been examined at the hospital on the night of the rape. However, although M.A. was taken to the hospital on the night of the rape, the record establishes only that a rape-kit examination was performed, not that she was examined for medical diagnosis or treated. M.A. was referred to the CCFA for further medical examination and treatment. Justice Pfeifer also contends that the nurse practitioner who examined M.A. after the interview would have asked all medically relevant questions during the examination. This is not true. The history obtained during Marshall’s interview was necessary for the nurse practitioner to make an accurate diagnosis and to determine what treatment was necessary. Horner, the nurse practitioner who examined M.A., testified that the “forensic interview guides my exam in that it lets me know whether or not I need to test the child for sexually transmitted infection. For instance, if a child says that a penis touched their vagina, it means to me that I need to test to make sure that child didn’t get a sexually transmitted infection.”
{¶ 40} In eliciting these medically necessary statements, Marshall acted as an agent of the nurse practitioner who examined M.A., not of the investigating police officers. Because Marshall did not act as an agent of the police in obtaining these statements, they are not inadmissible pursuant to Davis. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 25, 36.
{¶ 41} Statements made for medical diagnosis and treatment are nontestimonial. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 63. There is no *302 basis in the law for concluding that Marshall’s dual capacity renders statements made by M.A. for the purpose of medical diagnosis and treatment inadmissible pursuant to the Confrontation Clause. Indeed, in Davis, the United States Supreme Court acknowledged that the same interview or interrogation might produce both testimonial and nontestimonial statements. Davis, 547 U.S. at 828-829, 126 S.Ct. 2266, 165 L.Ed.2d 224. As the court stated in Davis, “This presents no great problem.” Id. at 829. “[TJrial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through in limine procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.” Id.
{¶ 42} Both dissents criticize our reliance on Davis in support of our conclusion that although M.A.’s forensic statements to Marshall were testimonial, her statements for the purpose of medical diagnosis and treatment were properly admitted. First, Justice Pfeifer argues that pursuant to Davis, when evidence includes testimonial and nontestimonial statements, the testimonial statements must be redacted or excluded to avoid violating the defendant’s right to confront witnesses against him. We agree that M.A.’s testimonial statements should have been excluded, and we remand the case to the court of appeals to determine whether the admission of M.A.’s testimonial statements was harmless error. Next, both dissents argue that our reliance on Davis is erroneous because we examine the statements on a question-by-question basis and the testimonial and nontestimonial statements were interspersed, rather than being obtained in separate and distinct portions of the interview. Justice Pfeifer argues that this will make it difficult to distinguish the statements that should be redacted from those that may be properly admitted. However, our guiding consideration is the purpose for which the statements are made, not the order in which they are obtained. Finally, both dissents note that unlike in Davis, there was no ongoing emergency in this case and, therefore, there was no occasion for the questioning in this case to evolve from nontestimonial to testimonial. Our decision is not based on the evolution of M.A.’s statements, but on the fact that the statements were made for different purposes. The fact that Davis involved an evolution from nontestimonial to testimonial statements does not preclude its application in instances in which an interview simultaneously serves dual purposes.
{¶ 43} Further, the fact that police officers watched the interview and that it was recorded does not change the fact that the statements were necessary for M.A.’s medical diagnosis and treatment. Similarly, the fact that information gathered for medical purposes is subsequently used by the state does not change the fact that the statements were made for medical diagnosis and treatment. Muttart, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 62. M.A.’s state *303 ments that were necessary for medical diagnosis and treatment were nontestimo-nial and were properly admitted without violating Arnold’s Confrontation Clause rights.
Conclusion
{¶ 44} When Marshall interviewed M.A. at the CCFA, she occupied dual capacities: she was both a forensic interviewer collecting information for use by the police and a medical interviewer eliciting information necessary for diagnosis and treatment. We hold that statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause. Thus, we affirm the judgment of the court of appeals to the extent that M.A.’s statements to Marshall for the purpose of medical treatment and diagnosis were properly admitted. We further hold that statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial. We agree with Arnold that the trial court erred in admitting the forensic statements made by M.A. to Marshall and reverse the court of appeal’s judgment insofar as it held that these forensic statements were admissible. However, because the court of appeals did not consider whether the admission of M.A.’s forensic statement to Marshall was harmless, see State v. Conway, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, we remand the case to the court of appeals to consider this issue.
Judgment affirmed in part and reversed in part, and cause remanded.
Lundberg Stratton, Lanzinger, and Cupp, JJ., concur.
Pfeifer and O’Donnell, JJ., dissent.
Brown, C. J., not participating.

. “DOVE” stands for “Developing Options for Violent Emergencies.” Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 2. The unit specializes in health-care services for victims of sexual assault and domestic disturbances. Id.