[Cite as *State v. Meyerson*, 2017-Ohio-8726.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No. 28549 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| ZACHARY MEYERSON | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR-2015-05-1643 |

DECISION AND JOURNAL ENTRY

Dated: November 29, 2017

CALLAHAN, Judge.

{¶1} Defendant-Appellant, Zachary Meyerson, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms in part and vacates in part.

I.

{¶2} On the evening of May 20, 2015, K.M.'s mother left him in the care of Mr. Meyerson, her former fiancé. K.M. was three years old at the time and his mother and Mr. Meyerson had been dating for about six months. When K.M.'s mother returned home from work, she found K.M. largely unresponsive. Mr. Meyerson claimed that K.M. had been fine all evening, but that he found him in an unresponsive state while trying to rouse him from sleep. K.M.'s mother then called for an ambulance, and K.M. was transported to Akron Children's Hospital. At the hospital, K.M. was diagnosed with a subdural hematoma and underwent emergency neurosurgery to relieve the pressure in his brain. The physicians who examined him also uncovered multiple burns on his body and extensive bruising to his anal cavity. Because all

of K.M.'s injuries were acute and indicative of abuse, the police questioned Mr. Meyerson. Following his interview, Mr. Meyerson was arrested in connection with the injuries that K.M. sustained.

{¶3} A grand jury indicted Mr. Meyerson on one count of rape, one count of felonious assault, and two counts of child endangering. Before trial, he filed a motion in limine, seeking to exclude certain statements K.M. made in the presence of his therapist, and later, his grandmother. The State responded in opposition to the motion, and the trial court held a hearing. K.M.'s therapist was not available to testify at the hearing because she unexpectedly passed away. Nevertheless, the court found that the statements K.M. made to her were admissible, so it allowed the State to present her therapy notes at trial through another witness. The court also found that the statements K.M. made in the presence of his grandmother were admissible, so it allowed his grandmother to testify as to those statements. The jury ultimately found Mr. Meyerson guilty on all counts, and the court sentenced him to a total of 25 years to life in prison.

{¶4} Mr. Meyerson now appeals from his convictions and raises two assignments of error for this Court's review. For ease of analysis, this Court reorders the assignments of error.

II.

{¶5} Before turning to the merits of Mr. Meyerson's assignments of error, this Court pauses to address a matter that the State has brought to this Court's attention. With the exception of certain, designated felonies, third-degree felonies are punishable by up to three years in prison. R.C. 2929.14(A)(3)(a), (b). The trial court here, however, sentenced Mr. Meyerson to five years in prison on one of his third-degree felony child endangering counts. Because child endangering is not one of the third-degree felonies for which a court may impose a sentence in excess of three years, *see* R.C. 2929.14(A)(3)(a), his sentence on that count is contrary to law.

*See State v. McMullen*, 9th Dist. Summit No. 26850, 2015-Ohio-1631, ¶ 6 (sentence not authorized by statute is contrary to law).

{¶6} Though Mr. Meyerson has not challenged his sentence on appeal, "'R.C. 2953.08(G)(2) permits an appellate court to * * * 'vacate [a] sentence and remand [a] matter to the sentencing court for resentencing' if [a] sentence is contrary to law.'" *State v. Vitt*, 9th Dist. Medina No. 11CA0071-M, 2012-Ohio-4438, ¶ 22, quoting *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, ¶ 4, quoting R.C. 2953.08(G)(2). *See also State v. Johnson*, 9th Dist. Summit No. 26788, 2013-Ohio-4680, ¶ 8. Moreover, this Court "can remand one offense[] of a multiple-offense sentence[] for resentencing without vacating the entire sentence." *Vitt* at ¶ 22, citing *Saxon* at paragraphs one, two, and three of the syllabus. This Court, therefore, vacates Mr. Meyerson's five-year prison sentence on his child endangering count and remands this matter to the trial court for it to resentence him on that count. *See Vitt* at ¶ 22-23; *Johnson* at ¶ 8, 14. Because this Court's remand does not affect the arguments that Mr. Meyerson has raised on appeal, this Court still addresses the merits of his assignments of error.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED THE STATE OF OHIO TO ELICIT HEARSAY TESTIMONY ON DIRECT EXAMINATION FROM A DECEASED WITNESS, AND PERMITTED TESTIMONY THAT DID NOT FIT AN EXCEPTION TO THE HEARSAY RULES.

{¶7} In his second assignment of error, Mr. Meyerson argues that the trial court erred when it admitted certain statements that K.M. made in the presence of his therapist, and later, his grandmother. Specifically, he argues that the statements were hearsay and not subject to admission under either Evid.R. 803(4) or Evid.R. 807. For the reasons that follow, this Court rejects his argument.

{¶8} The decision to admit or exclude evidence lies in the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). *Accord State v. Just*, 9th Dist. Wayne No. 12CA0002, 2012-Ohio-4094, ¶ 17 (abuse of discretion standard applied to court's admission of child victim's statements under Evid.R. 803(4)). "Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *State v. Aguirre*, 9th Dist. Lorain No. 13CA010418, 2015-Ohio-922, ¶ 6. An abuse of discretion indicates that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

**K.M.'s Statements to His Therapist**

{¶9} "Regardless of whether a child less than ten years old has been determined to be competent to testify * * *, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) * * *." *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, syllabus. That rule pertains to statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). "To determine whether statements are admissible under [Evid.R. 803(4)], a court must look to the primary purpose of the statements." *Just* at ¶ 19. Statements made for the primary purpose of medical diagnosis or treatment are nontestimonial and, therefore, admissible. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 28. Conversely, statements made for the primary purpose of forensic investigation are testimonial, *id.*, and admissible only if "the declarant is unavailable and the accused has had a

prior opportunity to cross-examine him [or her]." *State v. McNair*, 9th Dist. Lorain No. 13CA010485, 2015-Ohio-2980, ¶ 37, citing *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). In analyzing the primary purpose of a statement offered pursuant to Evid.R. 803(4), courts must consider the circumstances surrounding the statement. *Muttart* at ¶ 48.

> "[A] nonexhaustive list of considerations includes (1) whether the child was questioned in a leading or suggestive manner; (2) whether there is a motive to fabricate, such as a pending legal proceeding * * *[;] and (3) whether the child understood the need to tell the physician the truth. In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of [his] declarations. In addition, the court should be aware of the manner in which a * * * medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse."

*In re I.W.*, 9th Dist. Wayne Nos. 07CA0056 & 07CA0057, 2008-Ohio-2492, ¶ 15, quoting *Muttart* at ¶ 49.

{¶10} After his release from the hospital, K.M. began seeing Dr. Cynthia Keck-McNulty, a trauma therapist at Akron Children's Hospital. It is undisputed that he saw her multiple times from June 2015 until late October 2015. It is also undisputed that she unexpectedly passed away in early November 2015. At issue are certain statements that K.M. made to Dr. Keck-McNulty during a session that occurred in late August 2015. The State sought to admit the statements pursuant to Evid.R. 803(4). Because Dr. Keck-McNulty could not testify about K.M.'s statements or her sessions with him, the State relied upon her counseling session notes. It further relied upon (1) a transcript of her testimony in a different case in which she discussed her background and therapeutic practices; and (2) the testimony of Dr. Richard Daryl Steiner, the former Medical Director of the Children At Risk Evaluation ("CARE") Center at Akron Children's Hospital.

{¶11} When testifying in a different case, Dr. Keck-McNulty stated that she had practiced trauma therapy for almost twenty years and counseled children who had suffered physical or sexual abuse. She testified that she did not conduct forensic interviews, but took referrals from the CARE Center or Children Services for children who were in need of ongoing trauma therapy. She explained how, over the course of time, she would establish a therapeutic relationship with her patients that would allow them to feel comfortable enough to disclose any abuse that may have occurred. She testified that, as a therapist, she maintained an objective role and did not act as an investigator.

{¶12} Dr. Keck-McNulty's notes from her therapeutic sessions with K.M. reflect that, before she began counseling him, she met with his grandmother and mother for an initial diagnostic assessment. She then spent a full counseling session with K.M. simply playing, explaining the rules of therapy, and developing a relationship. Her notes reflect that she met with K.M. multiple times over the course of several months and generally discussed with his mother his progress and ongoing behavioral issues. The notes reflect that she spent significant time working with K.M. on his emotional responses and his feelings, noting his moods and various behaviors during each session. They also reflect that she frequently documented his statements or verbal outbursts and her responses thereto.

{¶13} Dr. Keck-McNulty's notes reflect that, on August 28, 2015, she had K.M. take part in an activity wherein he looked at a drawing of a child's body and she asked him to identify the private areas. After he did so, Dr. Keck-McNulty asked whether anyone had ever touched one of his private parts in a way that made him "feel mad, scared or confused." K.M. then responded "Mean Zack." Though it is not clear from a review of Dr. Keck-McNulty's notes whether the following statements occurred that same day or during a session that occurred a few

days later, her notes reflect that K.M. also said Mr. Meyerson: (1) "hit my head after he bent me"; (2) "hit me with a frickin' bat"; (3) "bent my legs over my head"; (4) "bit" his cheek and butt; (5) "put a freaking toy in my butt!!"; and (6) put the toy "all the way up my butt and made me poop [] poopy toys out my butt * * *."

{¶14} Dr. Steiner testified that he was asked to consult on K.M.'s case after his admission to Akron Children's Hospital. He explained that K.M. had to undergo neurosurgery for a traumatic brain injury caused by a combination of blunt force trauma and shaking. He stated that K.M. also presented with several burns to his cheek, arm, and buttocks that were characteristic of contact burns from a cigarette lighter. Additionally, K.M. had sustained extensive bruising to the area around his anus and his anal sphincter. Dr. Steiner testified that the bruising was consistent with an object having been forcefully inserted into the anal opening. After reviewing K.M.'s statements, Dr. Steiner described them as being "very consistent" with the injuries that K.M. had sustained.

{¶15} The trial court determined that K.M.'s statements to Dr. Keck-McNulty were made for the primary purpose of medical diagnosis and treatment and, therefore, were nontestimonial. The court noted that the statements were made during ongoing, one-on-one trauma therapy rather than a forensic interview. Further, the court found that there was no evidence Dr. Keck-McNulty had led K.M. to make the statements or that he had possessed an ulterior motive when he made them, particularly given his young age. Because the evidence showed that K.M. had a positive relationship with Dr. Keck-McNulty and made the statements in the context of one of their ongoing, therapeutic sessions, the court found the statements admissible.

{¶16} Mr. Meyerson argues that the court abused its discretion by admitting K.M.'s statements because "there [were] many questions and concerns regarding [their] reliability and veracity * * *." He notes that the statements came more than three months after the alleged incident and there was no indication that K.M. repeated them at multiple counseling sessions. He also notes that the social worker who initially interviewed K.M. at the hospital conceded that he had some difficulty following the rules about truth telling. Given the foregoing issues and the fact that there was no opportunity to cross-examine Dr. Keck-McNulty, Mr. Meyerson argues that the court ought to have excluded K.M.'s statements.

{¶17} Upon review, this Court cannot conclude that the trial court abused its discretion when it admitted K.M.'s statements to Dr. Keck-McNulty pursuant to Evid.R. 803(4). K.M. was only three years old at the time he made the statements, suggesting the absence of a motive to fabricate. *See Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, at ¶ 49. Additionally, Dr. Keck-McNulty's notes do not reflect that she questioned him in a suggestive manner. *See id.*, citing *State v. Dever*, 64 Ohio St.3d 401, 410 (1992). She previously testified that, as a therapist, she strove to maintain an objective role. The notes she took while treating K.M. are replete with descriptions of his emotional responses and remarks about his progress. Her notes confirm that her sessions with K.M. were in the nature of therapeutic counseling rather than forensic investigation. *See Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, at ¶ 28.

{¶18} Though Mr. Meyerson argues that K.M.'s statements are unreliable, Dr. Steiner testified that K.M.'s statements about the abuse he suffered were "very consistent" with his injuries. Further, statements made for the purpose of medical treatment enjoy a presumption of reliability. *Muttart* at ¶ 47. The State set forth evidence that K.M. made statements to Dr. Keck-McNulty in the context of their ongoing, one-on-one trauma therapy sessions. His statements,

describing the physical and sexual assault he endured and identifying his perpetrator, fell "'within the [Evid.R. 803(4)] exception, as statements made for purposes of diagnosis or treatment.'" *State v. Dasen*, 9th Dist. Summit No. 28172, 2017-Ohio-5556, ¶ 55, quoting *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, ¶ 15. Accordingly, the trial court did not abuse its discretion when it admitted them.

### K.M.'s Statements to His Grandmother

**{¶19}** Evid.R. 807 allows a proponent to introduce an out-of-court statement (1) made by a child under twelve, and (2) describing a sexual act or act of physical violence. The child's competency to testify need not be established, *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, syllabus, but "four elements [] must be satisfied before [the] child's out-of-court statement regarding abuse can be admitted." *State v. Lortz*, 9th Dist. Summit No. 23762, 2008-Ohio-3108, ¶ 20. The State must show that: (1) "the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness * * *"; (2) the child's testimony "is not reasonably obtainable"; (3) there exists "independent proof of the sexual act * * *"; and (4) the defendant was given notice, at least ten days before trial or hearing, of the content of the statement and the circumstances surrounding it. Evid.R. 807(A)(1)-(4).

**{¶20}** The State sought to introduce statements that K.M. made to his grandmother on August 28, 2015, directly after his counseling session with Dr. Keck-McNulty. At a pretrial hearing, K.M.'s grandmother testified that she took K.M. to his counseling session that day and briefly spoke with Dr. Keck-McNulty at the session's end. She then took K.M. outside where he caught sight of his reflection in some windows. According to the grandmother, K.M. then became extremely upset and began screaming in an angry tone. She testified that K.M. repeatedly screamed at his reflection: "Really, Zach, a freaking toy? You shoved a freaking toy

up my butt?" He then screamed: "That really hurt and it made me have to poop." K.M.'s grandmother testified that, after she reassured K.M. he was safe, he calmed down enough for her to take him home.

{¶21} The trial court determined that K.M.'s statements were admissible pursuant to Evid.R. 807, so his grandmother testified as to the statements at trial. Mr. Meyerson argues that the court abused its discretion by admitting that testimony because K.M. was incompetent to testify and the circumstances surrounding his statements showed their lack of trustworthiness. *See* Evid.R. 807(A)(1). Mr. Meyerson once again notes that K.M. was very young when he made the statements, he waited more than three months to make them, and there was evidence that he had some difficulty distinguishing between the truth and a lie.

{¶22} Even if the statements K.M. made in the presence of his grandmother were inadmissible, the record reflects that the court's error in their admission was "harmless beyond a reasonable doubt." *State v. Edwards*, 9th Dist. Summit No. 28164, 2017-Ohio-7231, ¶ 42. The statements mirrored the ones K.M. made to Dr. Keck-McNulty during his counseling session with her. Both sets of statements occurred near in time to each other, identified Mr. Meyerson as the perpetrator, and described him as having forced an object inside of K.M.'s anal cavity. The grandmother's testimony as to those statements was merely cumulative of the testimony the jury heard regarding K.M.'s statements to Dr. Keck-McNulty. *See State v. Hernon*, 9th Dist. Medina No. 3081-M, 2001 Ohio App. LEXIS 1276, *13 (Mar. 21, 2001) (error in admission of testimony "may be harmless beyond a reasonable doubt if it is cumulative"). Moreover, as discussed below, the jury heard a wealth of testimony about the nature of K.M.'s injuries, the approximate timeframe during which they occurred, and the fact that Mr. Meyerson was alone with him at that time. Having reviewed the record, this Court concludes that the court's error in admitting

the grandmother's testimony, if any, was harmless beyond a reasonable doubt. *See Edwards* at ¶ 42; *Hernon* at *13. As such, Mr. Meyerson's second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED DEFENDANT-APPELLANT MEYERSON'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER CRIMINAL RULE 29.

{¶23} In his first assignment of error, Mr. Meyerson argues that the trial court erred when it denied his Crim.R. 29 motion on his rape count. Specifically, he argues that the State failed to prove beyond a reasonable doubt the element of sexual conduct. This Court disagrees.

{¶24} "'[This Court] review[s] a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence.'" *State v. Bulls*, 9th Dist. Summit No. 27029, 2015-Ohio-276, ¶ 6, quoting *State v. Frashuer*, 9th Dist. Summit No. 24769, 2010-Ohio-634, ¶ 33. Whether the evidence in a case is legally sufficient to sustain a conviction is a question of law that this Court reviews de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶25} "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age * * *." R.C. 2907.02(A)(1)(b). The phrase "sexual conduct" includes the unprivileged insertion, "however

slight, of * * * any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). Whoever commits the foregoing offense is guilty of rape. R.C. 2907.02(B).

{¶26} K.M.'s mother testified that she and Mr. Meyerson started living together a few months before the incident giving rise to this appeal. She explained that Mr. Meyerson was not K.M.'s father, but became like a father to him. Because she worked in the evening and Mr. Meyerson worked during the day, they took turns caring for K.M. She testified that Mr. Meyerson's parenting practices often led to arguments between them, however, because she thought the punishments he inflicted on her son were, at times, overly harsh. She also stated that their relationship almost ended more than once because Mr. Meyerson became too stressed and could not cope with her son.

{¶27} The evening of May 20, 2015, was the first night that K.M., his mother, and Mr. Meyerson were to spend in their new apartment. K.M.'s mother testified that the three ate pizza together that evening before she left for work. She estimated that she left the apartment around 7:00 or 7:30 p.m. and did not return until after 1:00 a.m.

{¶28} One of the neighbors at the apartment testified that Mr. Meyerson began banging on her door after midnight. Mr. Meyerson asked to use her phone to call his girlfriend because her son "was running a fever and was nonresponsive." The neighbor described Mr. Meyerson as "very erratic" and indicated that he attempted to call his girlfriend multiple times to no avail. He then asked the neighbor to search for the number to his girlfriend's place of employment. Although the neighbor offered to call an ambulance or drive Mr. Meyerson and K.M. to the hospital, she testified that Mr. Meyerson declined her offer on the basis that "he didn't have the authorization * * * [t]o take [K.M.] to the hospital or seek treatment."

{¶29} After his calls to K.M.'s mother failed, Mr. Meyerson returned to his apartment and the neighbor followed. She testified that she followed Mr. Meyerson to a back bedroom where she saw K.M. lying on a mattress, flat on his back with his arms above his head. The neighbor testified that K.M. initially would not respond when she said his name or touched him, but that she and Mr. Meyerson eventually were able to rouse him to some degree when they placed a cold rag on his face. She testified that K.M. had difficulty remaining conscious and they eventually brought him into the kitchen and set him on the counter. While K.M. was still sitting on the counter, his mother returned from work.

{¶30} K.M.'s mother testified that she returned home to find her son awake, but unwilling to speak or move. Mr. Meyerson informed her that he had put K.M. to bed and returned sometime later to take him to the bathroom. At that point, however, he could not wake K.M., so he ran to the neighbor for help. K.M.'s mother testified that she immediately accepted the neighbor's offer to use her phone to call 911, but Mr. Meyerson suggested they wait longer. Fearful for her son, she ignored Mr. Meyerson's suggestion and called for help.

{¶31} EMS workers responded to the apartment at approximately 1:50 a.m. and brought K.M. to Akron Children's Hospital. Dr. Eric Singer, a staff physician, examined K.M. and noted that he had obvious bruising to his face and was difficult to arouse. A CT scan was performed and revealed a subdural hematoma and a midline shift of K.M.'s brain. Dr. Singer explained that the head bleed K.M. had suffered was creating pressure in his head and had caused his brain to shift to one side. The condition required emergency neurosurgery wherein K.M. underwent a craniectomy to relieve the pressure on his brain.

{¶32} Dr. Singer testified that head injuries of the sort K.M. suffered are generally caused by blunt force trauma. He described K.M.'s brain bleed as acute, meaning that it had

started within 36 hours of him arriving at the hospital. Additionally, he saw a number of other acute injuries when examining K.M. Dr. Singer specified that he observed multiple V-shaped burns on K.M.'s face, arm, and buttocks that were consistent with burns from a BIC lighter. Further, he stated that K.M.'s rectal area was freshly and intensely bruised in a manner consistent with "[s]omething [being] rammed in there." He noted that K.M.'s buttocks had to be physically pulled apart to be able to view the injury to his rectal area.

{¶33} Dr. Steiner, the former Medical Director of the CARE Center, testified that he was asked to consult on K.M.'s case. He testified that he had a wealth of experience in pediatric emergency trauma and frequently consulted when abuse concerns arose. During his consultation, Dr. Steiner reviewed all of K.M.'s records and test results and spoke with K.M.'s mother. Dr. Steiner ultimately concluded that K.M. had experienced a blunt force injury to his head and face in combination with a shaking injury. He further concluded that K.M. had sustained multiple imprint burns, consistent with a BIC lighter, and a traumatic, "[p]enetrating injury" to his anal cavity. As to the latter, he opined that the injury was caused by an instrument with a conical or circular shape. Dr. Steiner further opined that all of K.M.'s injuries occurred within 24 hours of his presentation to the hospital and were the result of non-accidental, violent events.

{¶34} The State presented evidence that the police searched Mr. Meyerson and K.M.'s mother's apartment after speaking with Dr. Steiner and receiving information about the likely shape and diameter of the instrument used to cause K.M.'s anal injuries. A search of the apartment yielded several possibilities, including two bongs that belonged to Mr. Meyerson. Both bongs were submitted to the Bureau of Criminal Investigation ("BCI") for testing. On the

mouthpiece of the larger bong, forensic scientists discovered a mixture of DNA profiles that were consistent with the profiles belonging to Mr. Meyerson and K.M.

{¶35} Detective Dominic Perella interviewed Mr. Meyerson at the police station a few hours after K.M. was taken to the hospital. He testified that Mr. Meyerson's statement changed significantly during the interview. When Mr. Meyerson first described his evening with K.M., he claimed that K.M. fell down at one point but that he was not hurt in the fall and went to sleep without incident. Mr. Meyerson stated that K.M. sustained a burn mark because he briefly tapped him with a hot lighter. He described how he became angry after he burned himself trying to light a candle and K.M. laughed at him. There was testimony, however, that the police were unable to find any candles at the apartment when they conducted their search. Moreover, Mr. Meyerson later admitted that he may have burned K.M. multiple times with the lighter when attempting to chase him. He also admitted that he spanked K.M.'s bare bottom that evening and, at one point, held his head to the wall when he refused to remain still in time out.

{¶36} As previously set forth, the State also introduced into evidence several statements that K.M. made to Dr. Keck-McNulty, his trauma therapist. In his statements to Dr. Keck-McNulty, K.M. specifically identified Mr. Meyerson as his perpetrator. He also described how Mr. Meyerson hit him in the head and shoved an item into his anal cavity.

{¶37} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have concluded that the State proved the element of sexual conduct beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. The State set forth evidence that K.M. sustained a forcible, penetrating injury to his anal cavity and that the injury was acute. It set forth evidence that K.M. was unharmed when his mother left him, but significantly injured when she returned home several hours later. During that time, K.M.

remained solely under the care of Mr. Meyerson. Moreover, Mr. Meyerson admitted that he inflicted at least some of the injuries that K.M. sustained that evening (i.e., the contact burns from the lighter). Based on the evidence the State presented, the jury reasonably could have concluded that Mr. Meyerson physically abused K.M. and, in the course of doing so, forcibly inserted an instrument into his anal cavity. As such, this Court must conclude that Mr. Meyerson's rape conviction is based on sufficient evidence. *See* R.C. 2907.01(A).

{¶38} In the argument portion of his brief, Mr. Meyerson also argues that his rape conviction is against the manifest weight of the evidence. Yet, his captioned assignment of error only pertains to the denial of his Crim.R. 29 motion for acquittal. This Court has held that "[a]n appellant's captioned assignment of error 'provides this Court with a roadmap on appeal and directs this Court's analysis.'" *State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 41, quoting *State v. Marzolf*, 9th Dist. Summit No. 24459, 2009-Ohio-3001, ¶ 16. This Court will not address arguments that fall outside the scope of an appellant's captioned assignment of error. *See Pleban* at ¶ 41. Because Mr. Meyerson has not separately assigned as error that his rape conviction is against the manifest weight of the evidence, this Court will not address his argument on that point. His first assignment of error is overruled.

### III.

{¶39} Mr. Meyerson's assignments of error are overruled. This Court reverses the judgment of the Summit County Court of Common Pleas only to the extent that it imposed upon Mr. Meyerson a five-year sentence for child endangering. His five-year sentence on that charge is vacated, and the matter is remanded for resentencing on that charge. Thus, the court's judgment is affirmed in part, reversed in part, and the cause is remanded in accordance with the foregoing opinion.

Judgment affirmed in part,
vacated in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

JACOB T. WILL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.