[Cite as *In re J.M.*, 2011-Ohio-3377.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

IN THE MATTER OF:          :
J.M.M.,                     :
Adjudicated Delinquent Child.    :       Case No. 08CA782
                                     :
                                     :       <u>DECISION AND</u>
                                     :       <u>JUDGMENT ENTRY</u>
                                     :    File-stamped date: 6-30-11

<u>APPEARANCES</u>

Timothy Young, Ohio Public Defender, and Sheryl Trzaska, Assistant Ohio Public Defender, Columbus, Ohio, for Appellant.

Robert Junk, Pike County Prosecutor, and Anthony A. Moraleja, Pike County Assistant Prosecutor, Waverly, Ohio, for Appellee.

Kline, J.:

{¶1} This case is before us on remand from the Supreme Court of Ohio. We reviewed the initial appeal of Appellant's[1] delinquency adjudication as well as his classifications as both a juvenile offender registrant and a tier III sex offender in *In re J.M.*, Pike App. No. 08CA782, 2009-Ohio-4574 (hereinafter "*In re J.M. I*"). In *In re J.M. I*, we affirmed, in part, and vacated, in part, the judgment of the trial court. The Supreme Court of Ohio remanded the case to us to consider Appellant's third assignment of error (from *In re J.M. I*) in light of *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742.

{¶2} In his third assignment of error, Appellant contends that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment of the United States Constitution when the trial court admitted testimonial hearsay statements made by

---

[1] Because one of the individuals discussed in this case has the same initials as the adjudicated delinquent (i.e., J.M.), we will refer to the adjudicated delinquent as the "Appellant."

declarants who were not available for cross-examination. Although we find that the trial court did admit some testimonial hearsay in violation of Appellant's Confrontation Clause rights, we find that the error was harmless beyond a reasonable doubt. Accordingly, we overrule Appellant's third assignment of error and remand this cause to the trial court for further proceedings consistent with our opinion in *In re J.M. I.*

I.

{¶3}   The events at issue in this case involve a family get-together where Appellant raped G.M., his four-year-old cousin. On July 3, 2007, Appellant and his parents went on a shopping trip, and, afterwards, they visited the home of C.M. (G.M.'s mother). There were several family members present, and shortly after Appellant's arrival, several children were playing in G.M.'s room. The children playing in G.M.'s room were Appellant (age fifteen at the time of the incident), J.M. (Not Appellant but G.M.'s cousin, age five), and S.M. (G.M.'s brother, age five), and G.M.

{¶4}   The testimony differs regarding how long Appellant and his family were at the get-together. At some point during the visit, P.H. (C.M.'s brother-in-law) went to check on the children in G.M.'s room. P.H. saw J.M. and S.M. sitting on a chair with a bicycle chain around their ankles. P.H. testified that J.M. cried and asked P.H. to untie her. P.H. told Appellant to untie the children, and Appellant did so. P.H. did not see G.M. in the room at that time, and he did not notice G.M. in any of the other rooms either.

{¶5}   Later, J.S. (G.M.'s grandmother) entered G.M.'s bedroom to take pictures of the children. J.S. noticed that Appellant was not with the children. J.S. also noticed that G.M. was acting strange. G.M. acted like she did not want J.S. to take her picture,

which was odd because G.M. was normally eager to have J.S. take her picture. J.S. eventually convinced G.M. to get in the picture with S.M. and J.M.

{¶6} While J.S. was still in the room, D.M. (Appellant's mother) entered the room looking for Appellant. D.M. began calling for Appellant, and Appellant answered her from inside G.M.'s closet. D.M. asked Appellant what he was doing inside the closet, and Appellant replied, "nothing." Feb. 5, 2008 Tr. at 162. D.M. told Appellant that "he had no business in the closet[,]" and Appellant exited the closet shortly thereafter. Id. at 163.

{¶7} After Appellant and his parents left the get-together, C.M. noticed that G.M. was acting abnormally. G.M. was unusually quiet, and she would not look at C.M. C.M. asked G.M. if something was wrong. C.M. testified that G.M. then disclosed "that her [i.e., G.M.] and [Appellant] were in the closet and that [Appellant] had stuck his pee-pee worm in her butt and he put it in her mouth to try to pee in her mouth." Id. at 150. Immediately after G.M.'s disclosure, C.M. contacted J.S. J.S. drove C.M. and G.M. to the Lancaster Hospital. After arriving at Lancaster Hospital, they were advised to go to Children's Hospital in Columbus.

{¶8} At Children's Hospital, Sarah Saxby (hereinafter "Saxby") interviewed G.M. Saxby is a clinical social worker and forensic interviewer. Over Appellant's objection, Saxby testified regarding G.M.'s statements during the interview. Saxby testified that "[G.M.] said that she [i.e., G.M.] was in her house playing in her room with her brother, and, I think, a cousin, and that [Appellant] took her into a closet – or she said he tied up her brother and the cousin and then took her into a closet. And * * * she said he rubbed his pee-pee all over my face and then put his pee-pee in my butt." Feb. 4, 2008 Tr. at

31. G.M. also indicated that the incident happened that day, i.e., July 3, 2007. Saxby established that G.M. understood the difference between "in" and "on," and G.M. stated that "her butt hurt." Id. at 33-34. G.M. also told Saxby that Appellant "talked mean" to G.M., but G.M. did not specify what she meant by "talked mean." Id. at 34. G.M. also indicated that this incident was the first time someone had done this to her.

{¶9} After Saxby interviewed G.M., Melody Brown (hereinafter "Brown"), a Sexual Assault Nurse Examiner (a "SANE nurse") examined G.M. Brown took pictures of G.M., which indicated that G.M. had three bruises on the back of her right thigh and a scrape where her left buttock meets her leg. Brown testified that the three bruises were in a three-dotted curve pattern, and the bruises could match up to an individual's fingers. And Dr. Kimberly Scansen (hereinafter "Scansen"), who also examined G.M. on the date of the incident, testified that "the locations of [G.M.'s] injuries are in an odd place for a child to have injuries, scrapes, and bruises." Feb. 4, 2008 Tr. at 98.

{¶10} G.M.'s mother testified that, following the incident, G.M. "wanted to be a baby all over again." Id. at 153. G.M. wanted to suck on a pacifier, which she had never done before. G.M. also wanted to wear baby clothes and diapers, despite being potty trained. G.M. also refused to sleep in her room after the incident; she insisted on sleeping with her mother and father.

{¶11} J.S. testified that she had been around G.M. "[j]ust about every day" since the incident. Feb. 5, 2008 Tr. at 165. J.S. also testified regarding G.M.'s regressed behavior following the incident. Specifically, J.S. testified as follows:

{¶12} "Q     After July 3rd, 2007[,] did you notice any changes in [G.M.]?

**{¶13}** "A      She started wanting to use a pacifier, baby diapers, which really bothered me a lot."  Id.

**{¶14}** Sharon Kuss (hereinafter "Kuss"), an outpatient therapist, provided counseling to G.M. following the incident.  Kuss noted that, during their initial session, G.M. exhibited behavior of a very young child.  Kuss testified that G.M. exhibited "stranger fear," and she refused to explore her environment, even though the environment was filled with toys.  Kuss testified that G.M.'s behavior was "extremely unusual in a four year old." Feb. 5, 2008 Tr. at 115.

**{¶15}** Kuss initially diagnosed G.M. with adjustment disorder with mixed disturbance of emotions and conduct.  Subsequently, Kuss confirmed the diagnosis after several counseling sessions with G.M.  Kuss testified that the diagnosis signifies "that there was clearly a traumatic psychosocial stressor, something happened. * * * It has to be something pretty significant for [a child] to have * * * such an abnormal reaction[.]"  Id. at 122.

**{¶16}** Helen Nemith, Kuss's supervisor, reviewed Kuss's diagnosis of G.M.  Nemith confirmed the diagnosis based on G.M.'s symptoms.

**{¶17}** At some point, J.M. disclosed that Appellant also abused her.  The record is not clear on when J.M. made this disclosure, but, on July 10, 2007, Diane Lamkins (hereinafter "Lamkins") interviewed J.M. at Children's Hospital.  Lamkins is a forensic interviewer and licensed social worker.  Lamkins' interview with J.M. was played at trial over Appellant's objection.  During the interview, J.M. told Lamkins that Appellant put his "'pee-pee worm' in her butt."  Plaintiff's Exh. 3.  Initially, J.M. stated that the incident happened in Appellant's room when J.M. and Appellant were alone.  J.M. also stated

that it happened in the pool, but she then indicated that Appellant only abused her once. It was unclear whether J.M. was indicating that there were multiple incidents. J.M. stated that Appellant told J.M. not to tell anyone about it. J.M. also indicated that Appellant showed her materials with "nasty" stuff of boys and girls.

{¶18} Appellant was charged in the Juvenile Division of the Court of Common Pleas in Fairfield County as being a delinquent for having committed two counts of rape. The charges related to the incident with G.M. only, and not J.M. The juvenile court held a trial February 4-6, 2008. Appellant was adjudicated a delinquent for having committed two acts that would constitute the crime of rape in violation of R.C. 2907.02(A)(1)(b), a felony of the first degree, if committed by an adult.

{¶19} The juvenile court in Fairfield County transferred Appellant's case to Pike County, where Appellant resided, for disposition and classification. In Pike County, the juvenile court committed Appellant to the custody of the Ohio Department of Youth Services for an indefinite term consisting of a minimum period of eighteen months and a maximum period not to exceed Appellant's twenty-first birthday. The court suspended the order on the condition that Appellant be on good behavior until age twenty-one and successfully complete a program at the Hocking Valley Community Residential Center. Appellant was also classified as a juvenile offender registrant and a tier III sex offender. The court then released Appellant to the custody of his parents.

{¶20} Appellant appealed in *In re J.M. I.* We affirmed, in part, and vacated, in part, the judgment of the trial court. We overruled all of Appellant's assignments of error, except for assignment of error seven. Appellant's trial counsel failed to argue that the trial court's classification of Appellant as a juvenile offender registrant and as a tier III

offender was discretionary, not mandatory.  We held, in assignment of error seven, that this amounted to ineffective assistance of counsel.  We remanded the case to the trial court for a reclassification hearing.

**{¶21}**  Appellant appealed our decision in *In re J.M. I* to the Supreme Court of Ohio.  After the court decided *Arnold*, it remanded Appellant's case to us to reconsider Appellant's third assignment of error.  Appellant moved to file a supplemental brief regarding assignment of error three, which we allowed.  The State did not file a supplemental brief on the issue.

**{¶22}**  On remand in light of *Arnold*, Appellant assigns the following error for our review.

III. "[APPELLANT'S] RIGHT TO CONFRONTATION, PURSUANT TO THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN HEARSAY STATEMENTS MADE BY NON-TESTIFYING JUVENILES WERE ADMITTED UNDER THE GUISE OF 'MEDICAL TREATMENT' AND EVIDENCE RULE 803(4)."

II.

**{¶23}**  Appellant contends that the trial court's admission of certain hearsay statements by G.M. and J.M. violated Appellant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.  Specifically, Appellant argues that some hearsay statements by G.M. and J.M. were elicited for a forensic or investigative purpose.  Thus, Appellant argues that the statements were testimonial under *Arnold* and that the trial court violated Appellant's rights under the Confrontation Clause by admitting the statements.  Appellant also contends that the error was not harmless beyond a reasonable doubt.

A. The Confrontation Clause

**{¶24}** We review the question of whether the trial court violated an individual's Confrontation Clause rights under a de novo standard. *State v. Rinehart*, Ross App. No. 07CA2983, 2008-Ohio-5770, at ¶20; *State v. Smith*, 162 Ohio App.3d 208, 2005-Ohio-3579, at ¶8; see, also, *United States v. Robinson* (C.A.6, 2004), 389 F.3d 582, 592.

**{¶25}** "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.' [And] this bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington* (2004), 541 U.S. 36, 42, quoting *Pointer v. Texas* (1965), 380 U.S. 400, 406.

**{¶26}** In *Crawford*, the court held that "[w]here testimonial evidence is at issue * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68. While the court did not comprehensively define "testimonial," it stated that the "core class" of testimonial statements included "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52.

**{¶27}** In *Davis v. Washington* (2006), 547 U.S. 813, the court refined the definition of "testimonial." The statements at issue in *Davis* were statements made to police by alleged victims of domestic violence. The court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police

assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. at 822.

**{¶28}** The Supreme Court of Ohio has analyzed whether various statements were testimonial in the wake of *Crawford* and *Davis*. In *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, the court analyzed statements made by a rape victim to a nurse practitioner during a medical examination at a hospital unit. Id. at ¶2. The court held the statements were nontestimonial. Id. at ¶47-48. The court noted that the statements were "made to a medical professional at a medical facility for the *primary* purpose of receiving proper medical treatment and not investigating past events related to criminal prosecution." Id. at ¶25 (emphasis sic).

**{¶29}** In *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, the court analyzed statements a child made to a social worker. The child disclosed that her father had put his penis in her mouth; had "'put his pee-pee in her pee-pee'[;]" and that the conduct had happened "'a whole bunch of times.'" Id. at ¶16. The court held these statements were nontestimonial because "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford*." Id. at ¶63.

**{¶30}** In *State v. Siler,* 116 Ohio St.3d 39, 2007-Ohio-5637, the court analyzed statements made by a child to a sheriff's deputy in the course of a police interrogation. The court held that courts should apply the primary-purpose test set forth in *Davis* to determine "whether a child declarant's statement made in the course of police interrogation is testimonial or nontestimonial." Id. at paragraph one of the syllabus,

citing *Davis* at 821-822. The court subsequently applied the primary-purpose test to a child declarant's statements made to a social worker acting as an agent of law enforcement. See *Arnold* at ¶35.

**{¶31}** In *Arnold*, the court analyzed whether admission of statements made to a social worker violate the confrontation clause where "the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Arnold* at ¶33. That is, the court analyzed statements made to a social worker acting in a dual capacity: as an agent for the police and as an agent of medical personnel. Id.

**{¶32}** The defendant in *Arnold* was accused of raping a child-victim. The victim's mother suspected that Arnold had sexually abused her daughter when she discovered Arnold and the victim locked in the victim's room. Id. at ¶3. After demanding entry into the victim's room, the victim's mother noticed that Arnold's boxer shorts were halfway off and that the victim's underwear was around her ankles. Id. The day after the incident, the victim's mother took the victim to a hospital where the victim spoke with a social worker from the Center for Child and Family Advocacy. Id. at ¶5. The court noted that the social worker served as an agent of both the police and medical personnel. Id. at ¶33.

**{¶33}** First, the court examined the victim's statements that primarily served an investigative purpose. Id. at ¶34. These statements included "[the victim's] assertion that Arnold shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of

Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." Id. The court determined that the social worker was acting as an agent of police, and "[t]he primary purpose of that portion of the interview was not to meet an ongoing emergency but, rather, to further the state's forensic investigation. Thus, these statements were testimonial in nature and their admission without a prior opportunity for cross-examination is prohibited by the Confrontation Clause." Id. at ¶36, citing *Crawford* at 68.

**{¶34}** Next, the court examined other statements the victim made, during the same interview, that were "necessary to diagnose and medically treat [the victim]." Id. at ¶37. The court noted that "[t]he history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary." Id. The court determined that "[the victim's] statements that described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' that Arnold's hand touched her 'pee-pee,' and that Arnold's mouth touched her 'pee-pee,' were thus necessary for the proper medical diagnosis and treatment of [the victim]." Id. at ¶38.

**{¶35}** The court held that "[s]tatements made for medical diagnosis and treatment are nontestimonial. * * * There is no basis in the law for concluding that [the social worker's] dual capacity renders statements made by [the victim] for the purpose of medical diagnosis and treatment inadmissible pursuant to the Confrontation Clause." Id. at ¶41, citing *Mutart* at ¶63.

**{¶36}** Thus, "[s]tatements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination." Id. at paragraph one of the syllabus. And, "[s]tatements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause." Id. at paragraph two of the syllabus.

**{¶37}** Admission of testimonial statements against a party is a constitutional error when that party does not have the opportunity to cross-examine the declarant. *Arnold* at ¶36, citing *Crawford* at 68. However, not all constitutional errors are prejudicial. We may decline to notice a constitutional error if the error is harmless beyond a reasonable doubt. *State v. Love*, Ross App. No. 05CA2838, 2006-Ohio-1824, at ¶34, citing *Chapman v. California* (1967), 386 U.S. 18, 24. "[E]rror is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." *State v. Williams* (1983), 6 Ohio St.3d 281, at paragraph six of the syllabus; *State v. Woods*, Ross App. No. 09CA3090, 2009-Ohio-6169, at ¶27.

### B.      The Challenged Statements

**{¶38}** Here, neither G.M. nor J.M. testified at trial. Instead, the State introduced their statements through various hearsay exceptions to which Appellant objected. G.M. made statements to Saxby, and J.M. made statements to Lamkins. These interviewers had essentially the same role as the social workers that interviewed the victim in *Arnold*. That is, Saxby and Lamkins each acted in a dual capacity as agents of both medical personnel and law enforcement. We must examine the hearsay statements admitted

against Appellant to determine whether the statements were testimonial. If the trial court admitted testimonial statements against Appellant from a declarant who was not available for cross-examination, then the trial court violated Appellant's rights under the Confrontation Clause. In which case, we must determine whether the error was harmless beyond a reasonable doubt.

### 1. G.M.'s Statements

**{¶39}** G.M. made statements to Saxby that were necessary for medical diagnosis and treatment, as well as statements that were forensic in nature. First, we analyze G.M.'s statements that she made for the purpose of medical diagnosis and treatment. G.M. told Saxby that Appellant "rubbed his pee-pee all over my face and then put his pee-pee in my butt." Feb. 4, 2008 Tr. at 31. Saxby also established that G.M. understood the difference between "in" and "on," and G.M. stated that "her butt hurt." Id. at 33-34. G.M. also indicated that the incident happened that day, i.e., July 3, 2007. (Appellant argues that G.M.'s statement that the incident happened that day was forensic in nature. However, we find that placing G.M.'s injury in a temporal context served a medical-diagnostic purpose.) Saxby testified that she communicates the information she receives in an interview with a patient to the medical team for medical diagnosis and treatment. Thus, Saxby acted as an agent of medical personnel when G.M. made these statements. And because these statements were made for medical diagnosis and treatment, they were nontestimonial. Therefore, the trial court did not violate Appellant's rights under the Confrontation Clause when it admitted these statements.

**{¶40}** Next, we analyze statements made to Saxby in her capacity as an agent of law enforcement rather than as an agent of medical personnel. G.M. told Saxby that

Appellant locked G.M. in a closet. G.M. also told Saxby that Appellant tied up S.M. and J.M. G.M. stated that Appellant talked mean to her (i.e., G.M.), and that this incident was the first time someone had done this to her. G.M. did not make these statements under circumstances objectively indicating that the primary purpose of the interview was to enable police assistance to meet an ongoing emergency. Additionally, these statements served a forensic or investigative purpose. The statements established past events, and they were potentially relevant to a later prosecution. Thus, the statements were testimonial. The trial court erred by admitting them into evidence because Appellant did not have the opportunity to cross-examine G.M.

### 2.    J.M.'s Statements

{¶41} J.M. made several statements to Lamkins. Lamkins testified that the purpose of the interview is for medical diagnosis and treatment. She indicated that a medical exam is given immediately after her interview with a child. Initially, we note that J.M. told Lamkins that Appellant put his "'pee-pee worm' in her butt." Plaintiff's Exhibit 3. Lamkins acted as an agent of medical personnel when J.M. made this statement. This statement by J.M. was nontestimonial because it was made for medical diagnosis or treatment. Thus, the trial court did not violate Appellant's rights under the Confrontation Clause when it admitted the statement.

{¶42} However, J.M. also made statements to Lamkins that were not for the purpose of medical diagnosis and treatment. Lamkins was acting as an agent of law enforcement with respect to some of J.M.'s statements. J.M. stated that the incident happened in Appellant's room when J.M. and Appellant were alone. J.M. also stated that it happened in the pool, but she then indicated that it happened only once. J.M. stated

that Appellant told J.M. not to tell anyone about it.  Finally, J.M. indicated that Appellant showed her materials with "nasty" stuff of boys and girls.  J.M. did not make these statements under circumstances objectively indicating that the primary purpose of the interview was to enable police assistance to meet an ongoing emergency.  These statements served a forensic or investigative purpose, and they were potentially relevant to a later prosecution.  Thus, these statements were testimonial.  As with G.M.'s statements, the trial court erred by admitting J.M.'s testimonial statements into evidence because Appellant did not have the opportunity to cross-examine J.M.

### C.      Harmless Beyond Reasonable Doubt Analysis

**{¶43}** As stated above, the trial court admitted testimonial statements made by both G.M. and J.M.  Because Appellant did not have the opportunity to cross-examine either of these individuals, admission of the testimonial statements violated Appellant's rights under the Confrontation Clause.  *Arnold* at ¶36.  Accordingly, we must determine whether the violation of Appellant's rights under the Confrontation Clause was harmless beyond a reasonable doubt.  *Love* at ¶34.  That is, we must determine if the remaining evidence, standing alone, constitutes overwhelming proof of Appellant's guilt.  *Williams* at paragraph six of the syllabus

**{¶44}** Appellant focuses largely on G.M.'s statements.  Appellant asserts that admission of G.M.'s testimonial hearsay statements was not harmless beyond a reasonable doubt.  Appellant argues that G.M.'s testimonial statements corroborated other evidence, and thus, bolstered G.M.'s credibility.  Appellant points to the State's closing argument, where the State noted how G.M.'s statements to Saxby provided important details that bolstered her credibility.

**{¶45}** We conclude, however, that absent G.M.'s and J.M.'s testimonial statements, the remaining evidence constitutes overwhelming proof of Appellant's guilt. Initially, we note that much of the testimonial evidence Appellant complains of was duplicative of other evidence. G.M.'s testimonial statement that Appellant had locked her up in a closet and raped her was also admissible, as a nontestimonial statement. G.M. told her mother "that her [i.e., G.M.] and [Appellant] were in the closet and that [Appellant] had stuck his pee-pee worm in her butt and he put it in her mouth to try to pee in her mouth." Id. at 150. The trial court admitted this statement as an excited utterance.[2] J.S. also testified that Appellant was in the closet when J.S. went to G.M.'s room to take pictures, and J.S. noted that G.M. was acting strange at the time. This testimony corroborates G.M.'s nontestimonial excited utterance to her mother regarding the incident in the closet.

**{¶46}** Appellant is correct that some testimonial evidence bolstered G.M.'s credibility. Specifically, P.H.'s testimony (i.e., that he found J.M. and S.M. tied up in a chair and that Appellant agreed to untie them) corroborates G.M.'s testimonial statement that Appellant tied up her brother and cousin. We also note that G.M.'s testimonial statement that Appellant "talked mean" to her corroborated, in some small measure, G.M.'s version of events.

---

[2] See Evid.R. 803(2) ("The following are not excluded by the hearsay rule, even though the declarant is available as a witness: * * * A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."); see, also, *Faieta v. World Harvest Church*, Franklin App. No. 08AP-527, 2008-Ohio-6959, at ¶66-67 (holding that statement made by child regarding abuse by care giver made two hours after incident qualified as excited utterance where the child's uncharacteristic behavior demonstrated that he was still under the stress of the event).

**{¶47}** Although some tainted evidence bolstered the State's case against Appellant, the remaining evidence of Appellant's guilt was overwhelming. G.M. told Saxby that Appellant "rubbed his pee-pee all over my face and then put his pee-pee in my butt." Feb. 4, 2008 Tr. at 31. G.M. told her mother essentially the same thing. Additionally, Gail Horner, a SANE nurse designated as an expert in child sexual abuse, testified that it was unusual for a four or five year old child to be able to describe acts of sodomy or oral sex, unless such an act had happened to the child, or the child had viewed explicit pornography. (At trial, Appellant attempted in vain to show that G.M. had been exposed to explicit pornography.)

**{¶48}** Following the interview with Saxby, Brown took pictures of G.M., which indicated that G.M. had three bruises on the back of her right thigh and a scrape where her left buttock meets her leg. Brown testified that the three bruises were in a three-dotted curve pattern and could match up to an individual's fingers. And Dr. Kimberly Scansen, who examined G.M. on the date of the incident, testified that "the locations of [G.M.'s] injuries are in an odd place for a child to have injuries, scrapes, and bruises." Feb. 4, 2008 Tr. at 98.

**{¶49}** In addition to G.M.'s statements to Saxby, G.M. informed her mother, C.M., what Appellant had done shortly after Appellant and his family left the get-together. C.M. also testified that, after the incident, G.M. "wanted to be a baby all over again." Id. at 153. G.M. wanted to suck on a pacifier and also wear baby clothes and diapers. J.S. confirmed C.M.'s testimony regarding G.M.'s regressive behavior. G.M. also refused to sleep in her room after the incident. Instead, she insisted on sleeping with her mother and father.

**{¶50}** In her initial counseling session with G.M., Kuss noted that G.M.'s behavior was "extremely unusual in a four year old." Feb. 5, 2008 Tr. at 115. Kuss diagnosed G.M. as suffering from an adjustment disorder with mixed disturbance of emotions and conduct. Kuss testified that the diagnosis signifies "that there was clearly a traumatic psychosocial stressor, something happened. * * * It has to be something pretty significant for [a child] to have * * * such an abnormal reaction[.]" Id. at 122. Finally, Kuss did not discover any possible psychological stressors other than the incident with Appellant. We note that the testimonial statement by G.M. that the incident with Appellant was the first time anyone had ever done this to her bolsters Kuss's diagnosis. However, Kuss had multiple counseling sessions with G.M. Kuss's failure to discover other traumatic events in G.M.'s life during these sessions corroborates her diagnosis, and G.M.'s testimonial statement does not taint Kuss's diagnosis.

**{¶51}** In addition to the evidence of Appellant's rape of G.M., J.M. also disclosed that Appellant put his "'pee-pee worm' in her butt." As the trial court noted, this evidence was admissible to show Appellant's identity or "modus operandi." Both G.M. and J.M. are of tender age, both are relatives of Appellant, and both claim that Appellant committed the same act, i.e., sodomy.

**{¶52}** We conclude that there was overwhelming evidence of Appellant's guilt. Therefore, the admission of statements in violation of Appellant's rights under the Confrontation Clause was harmless beyond a reasonable doubt. As detailed above, G.M. told her mother that Appellant raped her in the closet. G.M.'s admissible statements to Saxby were consistent with her accusation. Additionally, the medical professionals examining G.M. on the night of the incident noticed bruises and scrapes

consistent with G.M.'s accusation. G.M.'s behavior regressed dramatically following the incident. Finally, G.M.'s counselor diagnosed G.M. with a behavioral condition caused by a traumatic psychosocial stressor. And the counselor indicated that she did not discover any stressor other than Appellant's rape of G.M.

**{¶53}** Accordingly, we overrule Appellant's third assignment of error.

III.

**{¶54}** In conclusion, we overrule Appellant's third assignment of error and affirm the part of the trial court's judgment involving the same. We remand this cause to the trial court for a reclassification hearing consistent with our decision in *In re J.M. I.*

**JUDGMENT AFFIRMED AND CAUSE REMANDED.**

.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED as it relates to the third assignment of error and this cause BE REMANDED to the trial court for a reclassification hearing. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.

Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment Only.

For the Court

BY: _____
Roger L. Kline, Judge

**NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**