[Cite as *State v. Clark*, 2011-Ohio-6623.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No. 96207

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DARIUS CLARK

DEFENDANT-APPELLANT

---

## JUDGMENT:
## REVERSED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-536300

BEFORE:    Sweeney, J., Blackmon, P.J., and E. Gallagher, J.

RELEASED AND JOURNALIZED:    December 22, 2011

ATTORNEYS FOR APPELLANT

Robert Tobik, Esq.
Chief Public Defender
By: Nathaniel McDonald, Esq.
Assistant Public Defender
310 Lakeside Avenue, Suite 400
Cleveland, Ohio 44113


ATTORNEYS FOR APPELLEE

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Jennifer A. Driscoll, Esq.
        Mark J. Mahoney, Esq.
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113


JAMES J. SWEENEY, J.:

{¶ 1} Defendant-appellant Darius Clark ("defendant") appeals his multiple convictions for felonious assault, child endangerment, and domestic violence regarding his girlfriend's two children, and his associated 28-year prison sentence. After reviewing the facts of the case and pertinent law, we reverse and remand for a new trial.

{¶ 2} During the time pertinent to this case, defendant was living with his girlfriend ("mother") and her two children, L.P., who was born on September 26, 2006, and A.T., who was born on May 17, 2008. From March 8 through March 12, 2010, the children were under the care of defendant while mother was staying with a friend. On

March 16, 2010, mother again left the children in defendant's care. At all other times pertinent to this appeal the children were under the care of defendant and mother.

{¶ 3} On March 17, 2010, L.P.'s preschool teachers noticed bruises on him and reported possible abuse to the authorities. On March 18, 2010, a social worker found the children at defendant's mother's house, where they were being looked after by two teenagers. After awhile, defendant's mother arrived at the house, and eventually, the social worker took the children to the hospital. According to the doctor who examined the children, L.P. had multiple bruises in various stages of development and abrasions consistent with being whipped with a belt. A.T. had multiple bruises and burn marks, a swollen hand, and a pattern of sores at her hairline consistent with braids being ripped out of her head. The doctor suspected child abuse and estimated that the injuries occurred between February 28 and March 18, 2010. In response to questions from several adults, L.P. stated that "Dee did it." It is undisputed that defendant's nickname is "Dee."

{¶ 4} On April 15, 2010, defendant and mother were charged with the following: five counts of felonious assault in violation of R.C. 2903.11(A)(1), two counts of endangering children in violation of R.C. 2919.22(B)(1), and two counts of domestic violence in violation of R.C. 2919.25(A). Mother pled guilty to three of the counts, and the court postponed her sentencing until after defendant's trial.

{¶ 5} On November 16, 2010, the court held a hearing and found four-year-old L.P. incompetent to testify. The court also summarily denied defendant's motion in limine requesting that evidence of L.P.'s out-of-court statements identifying defendant be

excluded from trial. On November 22, 2010, a jury found defendant guilty of all counts except one of the felonious assault charges concerning A.T. The court sentenced defendant to eight years in prison for each felonious assault conviction, four years in prison for each count of endangering children, and six months in prison for each count of domestic violence. The court ran three assault sentences and one endangering children sentence consecutively for an aggregate of 28 years in prison.

{¶ 6} Defendant appeals and raises nine assignments of error for our review. We address the assignments of error out of order where appropriate, starting with assignments of error three and four.

{¶ 7} III. "The trial court violated Mr. Clark's confrontation clause rights pursuant to the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution by admitting prejudicial out-of-court statements by [L.P.]."

{¶ 8} IV. "The trial court violated Mr. Clark's confrontation clause rights pursuant to the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution when it erroneously found that the requirements of Ohio Rule of Evidence 807 had been satisfied."

{¶ 9} In the instant case, the court denied defendant's motion in limine and ruled admissible L.P.'s out-of-court statements that "Dee did it." Seven witnesses testified as to what L.P. stated: Cleveland police detective Jody Remington; Cuyahoga County Department of Children and Family Services [CCDCFS] social worker Sarah Bolog; CCDCFS social worker Howard Little; L.P.'s assistant preschool teacher Ramona

Whitley; L.P.'s lead preschool teacher Debra Jones; the children's maternal grandmother; and the children's maternal great aunt.

{¶ 10} Defendant argues that the court erred by admitting L.P.'s statements at trial, because the statements were testimonial in nature, L.P. was declared incompetent to testify, and defendant did not have the opportunity to cross-examine L.P.

### *The Confrontation Clause*

{¶ 11} We review issues concerning Confrontation Clause violations under a de novo standard. *State v. Babb*, Cuyahoga App. No. 86294, 2006-Ohio-2209. Pursuant to the Sixth Amendment to the United States Constitution, out-of-court statements that are testimonial in nature are inadmissible unless the declarant is unavailable and the defendant was given a prior opportunity for cross-examination. *Crawford v. Washington* (2004), 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. This test does not apply to nontestimonial hearsay. Id. See, also, *Michigan v. Bryant* (2011), 562 U.S. _____, 131 S.Ct. 1143, 1167, 179 L.Ed.2d 93 (holding that the statements at issue were not testmonial and "leav[ing] for the [state] courts to decide on remand whether the statements' admission was otherwise permitted by state hearsay rules").

{¶ 12} Thus, as a threshold matter, courts must determine whether statements are testimonial before subjecting them to *Crawford* standards. Id. at 51-52. Testimonial statements are, among other things, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. (Internal citations omitted.)

{¶ 13} The definition of testimonial statements was further scrutinized in *Davis v. Washington* (2006), 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224, where the United States Supreme Court held the following: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

{¶ 14} In *Davis*, the victim's statements to a 911 operator were found to be nontestimonial, as their primary purpose was "to enable police assistance to meet an ongoing emergency." Id. at 828. However, the victim's statements to police officers who responded to the domestic-violence call were held to be testimonial, because "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." Id. at 830.

{¶ 15} The Ohio Supreme Court applied this body of law to statements made to a medical professional in *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834. The *Stahl* court distinguished *Davis*, and held that a rape victim's statements to a nurse practitioner during a medical examination were nontestimonial, because the primary purpose was receiving medical treatment. Id. at ¶25. "In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner

is relevant only if it could affect a reasonable declarant's expectations." Id. at paragraph two of the syllabus.

{¶ 16} In *State v. Siler*, 116 Ohio St.3d 39, 2007-Ohio-5637, 876 N.E.2d 534, ¶30, the Ohio Supreme Court further addressed this issue, holding that "to determine whether a child declarant's statement made in the course of police interrogation is testimonial or nontestimonial, courts should apply the primary-purpose test" enunciated in *Davis*. The court also stated that the objective-witness test found in *Stahl* applies when the interrogator is not in law-enforcement. *Siler* at ¶28. The distinction between the two tests is "based on the identity of the interrogator and the purpose of the questioning." Id. Additionally, the court concluded that "the age of a declarant is not determinative of whether a testimonial statement has been made during a police interrogation." Id. at ¶41.

{¶ 17} The issue of child victims' testimony was addressed most recently by the Ohio Supreme Court in *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶11, where the court determined the following: "whether, in a criminal prosecution, the out-of-court statements made by a child to an interviewer employed by a child-advocacy center violates [sic] the right to confront witnesses * * *." *Arnold* recognized that the child advocate who interviewed the victim worked in a "dual capacity," such that the questioning "might produce both testimonial and nontestimonial statements." Id. at ¶41. The court explained the child advocate's dual capacity as follows: "she was both a forensic interviewer collecting information for use by the police

and a medical interviewer eliciting information necessary for diagnosis and treatment." Id. at ¶44.

{¶ 18} *Arnold* concluded that statements regarding "medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause. * * * We further hold that statements * * * that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial." Id. Additionally, the court held that the "forensic statements" were subject to a harmless error review. Id.

{¶ 19} In the instant case, L.P.'s statement to Detective Remington that "Dee did it" was primarily investigative or forensic in nature, as the detective was clearly a member of law enforcement. Detective Remington testified about her interaction with L.P. as follows: "As long as we played, he was okay. He was pretty enamored with my badge, like most little boys are. So I gave him the badge, and I told him I'm the police, and I'd like to help you. I'd like to make sure nobody ever hurts you like this again. Can you tell me who hurt you?" There is no suggestion that L.P.'s identification of defendant as the abuser was elicited for medical purposes or to assist an ongoing police emergency. Therefore, this testimony was improperly admitted at trial.

{¶ 20} Bolog testified that she is an investigator for CCDCFS. Her primary duties are to "gather information to determine if, according to the Ohio Revised Code, there is substantial evidence for child abuse or neglect or dependency issues." She testified that

the "bottom line" purpose for her investigation is "making sure that the minors in Cuyahoga County are safe and have stable provisions for their basic needs." Bolog testified that L.P. told her who abused him on two occasions:

{¶ 21} "The first time was in [defendant's mother's house] and it was right before the commotion * * * and, you know, the police were there and everything was going on. * * * I was showing him pictures of my dogs, and we were trying to gain that trust. And in talking about things non-related, we would throw in a question about the investigation. So it was like fun question, fun question, fun question, how did you get this mark on your face? And his body language changed. * * * And he said — he put his head down and he said, Daddy did it. Dee did it. And he just said Dee did it.

{¶ 22} "And then the second instance where he said it in front of me was at the hospital. Detective Remington and her partner had come in. * * * And [L.P.] was very interested in her badge and handcuffs, you know. * * * And at this point, she had a picture of [defendant]. And she asked [L.P.] if he knew who this was, and he said, you know — looked at it and * * * turned his head and said, It was daddy. It was Dee. So when asked * * * how did you get these marks? What happened? And he said again, Dee did it."

{¶ 23} We analyze L.P.'s statements to Bolog under the framework of *Arnold*, insomuch as Bolog, as a social worker, acted in a dual capacity. In *Arnold*, the court found that some of the victim's statements to the child advocate were made with a primary purpose to "gather forensic information to investigate and potentially prosecute a

defendant for the offense." *Arnold* at ¶33. These statements included: the "assertion that Arnold shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." Id. at ¶34.

{¶ 24} The *Arnold* court reasoned that the statements "involved a description of past events," specifically concerning the abuse, the victim had been discharged from the hospital and there was no medical emergency, and "the interview was rather formal, more akin to the videotaped, planned interview of *Crawford* than to the frantic 9-1-1 call or the sequestered but spur-of-the moment interview recounted in *Davis*." Id. at ¶35.

{¶ 25} The court additionally determined that other statements made during the same interview were "medically necessary," because, for example, certain information can trigger the administration of a rape kit or a test for sexually transmitted diseases. Id. at ¶39. See, also, *In re J.M.*, Pike App. No. 08CA782, 2011-Ohio-3377, ¶39 (holding that a child-victim's statement that the incident occurred on July 3, 2007 was not testimonial because "placing [the] injury in a temporal context served a medical-diagnostic purpose").

{¶ 26} Upon review, we find that Bolog was acting as an agent of law enforcement when L.P. identified defendant as the person who abused him. This information established defendant as a suspect in the investigation. Furthermore, although removing victims from abusive situations may fall under Bolog's duty to keep children safe, under the circumstances of the instant case there was no evidence of an ongoing police

emergency. Accordingly, L.P.'s statements to Bolog were testimonial, and because L.P. was not subject to cross-examination, the statements were improperly admitted at trial.

{¶ 27} Little testified that he is an intake social worker at CCDCFS, and his job duties are "to investigate allegations of abuse and neglect, dependency, [and] emotional maltreatment." Asked what he talked to L.P. about when he arrived at the daycare, Little testified as follows:

{¶ 28} "I talked to L.P. basically about how did he receive the bruising that was on his left facial area and also about basically trying to get more information about who was * * * Dee.

{¶ 29} "* * *

{¶ 30} "[L.P.] mentioned that Dee was his father, that he lived in the home. He had mentioned that — first that he had sustained some marks and bruises from falling down the stairs. But when I re-questioned him and tried to make him feel a little bit more comfortable, he later stated that the bruises came because he didn't put his toys back up and they were thrown all over the floor. So that's why he got a spanking for that."

{¶ 31} Upon review, we find that Little's discussion with L.P. was part of the preliminary investigation to aid law enforcement. There is no indication that L.P.'s statements were made in the midst of a police emergency. Additionally, there is no evidence that the statements were made in the context of medical treatment or diagnosis. Accordingly, L.P.'s statements to Little were testimonial and inadmissible at trial.

{¶ 32} Two of L.P.'s teachers testified at defendant's trial about L.P.'s out-of-court statements. It is an issue of first impression for this court whether statements made to teachers may be testimonial in nature, and thus subject to analysis under *Crawford*.

{¶ 33} Ramona Whitley, who was L.P.'s assistant preschool teacher at the time the abuse was discovered, testified that on March 17, 2010, she noticed that L.P.'s eye was bloodshot and he had "welt marks" on his face. Whitley testified that as part of her job, she is "supposed to always observe [the children], look for different things, what's going on with them." Whitley brought L.P.'s injuries to the attention of a co-worker. Whitley was instructed to make "the 696 call," which she explained is "a number that you call if a child is in need for some sort of service, if the child is hurt, being physically abused, sexually abused, there's a number that we call to make sure everything's okay." Whitley testified that she is a "mandatory reporter," meaning that "by law I have to report what is going on when it comes to the safety of a child." Whitley testified that when she asked L.P. what happened, he gave three different answers: that he fell; that he did not know; and that "Dee did it." Additionally, Whitley made a statement to the Cleveland police two to three days later.

{¶ 34} Debra Jones, who was L.P.'s lead preschool teacher, testified that on March 17, 2010, Whitley brought L.P.'s injuries to her attention. Jones took L.P. out of the classroom and asked him what happened. L.P. looked "bewildered * * * he almost looked uncertain, but he said, Dee did it." Jones testified that she took L.P. to her supervisor's office and Whitley called 696-KIDS because "we saw enough to make the

call." Jones testified that two days later she met with and gave a statement to a detective from the Cleveland Police Department.

{¶ 35} Upon review, we find that the primary purpose of Jones and Whitley questioning L.P. was to report potential child abuse to law enforcement. Both teachers testified that their obligation to report is mandatory. We additionally find that it is reasonable for an objective witness to expect that statements made to a teacher while she is reporting suspected child abuse may be used at a later trial. Therefore, we conclude that L.P.'s statements to Whitley and Jones were testimonial and improperly admitted at defendant's trial.

### *Evid.R. 807*

{¶ 36} Out-of-court statements that are not testimonial in nature are considered hearsay, which is generally inadmissible at trial, unless it falls within one of many exceptions to the rule against hearsay and is "sufficiently reliable for admission." See *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶25. We review the admissibility of relevant evidence under an abuse of discretion standard. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. At issue are L.P.'s statements to grandmother and great aunt. Asked if she ever talked to L.P. "about who did this to him," great aunt testified that "[h]e laid in my lap, and he told me Dee did it." Asked "did you ever find out who caused those injuries to the children," grandmother testified that "[L.P.] told me Dee."

**{¶ 37}** Defendant argues that these statements are inadmissible hearsay pursuant to Evid.R. 807(A), which states as follows:

**{¶ 38}** "An out-of-court statement made by a child who is under twelve years of age at the time of trial or hearing describing * * * any act of physical violence directed against the child is not excluded as hearsay under Evid.R. 802 if all of the following apply:

**{¶ 39}** "(1) The court finds that the totality of the circumstances surrounding the making of the statement provides particularized guarantees of trustworthiness that make the statement at least as reliable as statements admitted pursuant to Evid.R. 803 and 804. The circumstances must establish that the child was particularly likely to be telling the truth when the statement was made and that the test of cross-examination would add little to the reliability of the statement. In making its determination of the reliability of the statement, the court shall consider all of the circumstances surrounding the making of the statement, including but not limited to spontaneity, the internal consistency of the statement, the mental state of the child, the child's motive or lack of motive to fabricate, the child's use of terminology unexpected of a child of similar age, the means by which the statement was elicited, and the lapse of time between the act and the statement. In making this determination, the court shall not consider whether there is independent proof of the sexual act or act of physical violence.

**{¶ 40}** "(2) The child's testimony is not reasonably obtainable by the proponent of the statement.

**{¶ 41}** "(3) There is independent proof of the sexual act or act of physical violence.

{¶ 42} "(4) At least ten days before the trial or hearing, a proponent of the statement has notified all other parties in writing of the content of the statement, the time and place at which the statement was made, the identity of the witness who is to testify about the statement, and the circumstances surrounding the statement that are claimed to indicate its trustworthiness."

{¶ 43} Defendant essentially argues that, under the circumstances in the instant case, L.P.'s statements were not reliable under the first element of Evid.R. 807(A), and that, under the third element, there was no independent proof that he was the perpetrator of the act of physical violence.

{¶ 44} In *State v. Silverman*, 121 Ohio St.3d 581, 2009-Ohio-1576, 906 N.E.2d 427, ¶34, the Ohio Supreme Court held that "a hearsay statement of a child declarant can be admitted under Evid.R. 807 without a determination of the child's competence to testify."

{¶ 45} In *Silverman*, the child victim was killed; thus, the court did not determine whether she was competent to testify. *Silverman* limited the holding in *State v. Said* (1994), 71 Ohio St.3d 473, 644 N.E.2d 337, which required a finding of competency prior to admitting a statement under Evid.R. 807. *Silverman* at ¶30.

{¶ 46} The instant case is distinguishable from *Silverman* and *Said*, because, after a hearing, the court found L.P. incompetent to testify.

{¶ 47} "Counsel, * * * I believe — I've heard enough out of — this child is not competent to testify. Watching the — he's gone already. Watching his demeanor on

the stand — and it's, by the way, perfectly understandable to deal with this kind of behavior, but he's definitely not competent in this Court's opinion. So that's my ruling. He will not be able to testify as a witness."

{¶ 48} In applying the circumstances of the case at hand to Evid.R. 807, we must determine whether L.P. "was particulrly likely to be telling the truth" when stating that "Dee did it." First, the evidence is inconclusive as to whether these statements were spontaneous declarations by L.P. or answers to questions posed by others. Second, L.P. repeatedly stated that Dee abused him; however, L.P. also stated that a fall down the stairs caused the bruises and that he did not know how he got the bruises. Third, the evidence in the record shows that L.P.'s mental state was understandably somewhat unstable and that he was undergoing counseling. Fourth, the record is silent on L.P.'s "motive or lack of motive to fabricate." Fifth, L.P. used terminology expected of a four-year-old — "Dee did it." Sixth, "the means by which the statement was elicited" is unclear from the record. We note, however, that all of L.P.'s statements previously analyzed under *Crawford* were made in response to investigative questions asked by adults. Seventh, the record does not establish when L.P. identified defendant as his abuser to his grandmother and great aunt.

{¶ 49} We turn to the third element of Evid.R. 807, which generally questions whether there is independent proof of the act of physical violence. However, in the instant case, the question is not whether the abuse occured; rather, it is "Who abused

L.P.?"   Under a similar fact pattern, the United States Court of Appeals, Sixth Circuit, found that admission of evidence identifying the abuser was not harmless error:

{¶ 50} "In the instant case, L.B.'s taped statements contained the only evidence that she had been raped by Mr. Gaston.   While there was physical evidence that L.B. had been the victim of sexual abuse, the physical evidence did not support an inference that Mr. Gaston was the perpetrator.   The denial of the right to cross-examine L.B. had a substantial and injurious effect on the jury's verdict.   Accordingly we conclude that the trial court's errors were not harmless."   *Gaston v. Brigano* (C.A. 6, 2006), 208 Fed.Appx. 376, 392.

{¶ 51} Pursuant to Crim.R. 52(A), "[a]ny error * * * which does not affect substantial rights shall be disregarded."   In *State v. Cooper*, Cuyahoga App. No. 86437, 2006-Ohio-817, ¶19, we held that "[t]he defendant has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error. Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal."

{¶ 52} Upon review, we find that L.P.'s statements lacked the "particularized gurantees of trustworthiness" outlined in Evid.R. 807.   Although Ohio law is not clear on this precise point, we are concerned with reconciling the court's finding L.P. incompetent to testify in November of 2010 with the court's finding that statements L.P. made eight months prior were reliable enough to be admitted at trial.   Compare *State v. Street* (1997), 122 Ohio App.3d 79, 85, 701 N.E.2d 50 (opining that finding a child witness incompetent

to testify requires the "conclusion that any earlier statements he made were inadmissible under Evid.R. 807. * * * We find it unreasonable to presume that [the child witness] might have been more competent at an earlier age, such as when the statements in question were made") (emphasis in original).

{¶ 53} Additionally, we find that the only direct evidence that defendant was the perpetrator was L.P.'s statements identifying him. The evidence shows that when mother left L.P. in defendant's care, L.P. was staying at defendant's mother's house with various family members. Therefore, we conclude that L.P.'s statements to grandmother and great aunt are inadmissible hearsay under Evid.R. 807. Coupled with L.P.'s improperly admitted testimonial statements under *Crawford*, we find prejudicial error in the court's ruling regarding L.P.'s statements that "Dee did it." We are aware of the sensitive nature of this case and any case concerning victims of child abuse. The injuries to these children are reprehensible, and the perpetrator deserves punishment. Notwithstanding, we must recognize and ensure "the Sixth Amendment's guarantee that, '[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him.'" *Crawford,* 541 U.S. at 38. The right to a fair trial is paramount to the delivery of a just verdict.

{¶ 54} Accordingly, defendant's third and fourth assignments of error are sustained.

{¶ 55} Defendant's first assignment of error states as follows:

{¶ 56} I. "Mr. Clark's convictions with respect to counts 1 and 6 are not supported by legally sufficient evidence as required by state and federal due process."

**{¶ 57}** Specifically, defendant argues that the state failed to present sufficient evidence of serious physical harm to support the felonious assault and endangering children convictions regarding L.P. Both of these offenses contain an element of "serious physical harm," which is defined in R.C. 2901.01(A)(5) as follows:

**{¶ 58}** "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

**{¶ 59}** "(b) Any physical harm that carries a substantial risk of death;

**{¶ 60}** "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

**{¶ 61}** "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

**{¶ 62}** "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain."

**{¶ 63}** When reviewing sufficiency of the evidence, an appellate court must determine, "after viewing the evidence in a light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

**{¶ 64}** Upon review, we find the following evidence in the record:

**{¶ 65}** Dr. Jeffrey Pennington, who is an emergency medicine physician, testified that he examined L.P. and A.T. for suspected child abuse on March 18, 2010. He

observed "linear vertical abrasions with [bruising] on the upper torso, left chest, [and] bilateral medial thighs" of L.P. According to Dr. Pennington, these bruises were typical of "being beaten with objects that leave particular marks," and meant "that you were struck with something that left a very sharp mark" such as "a belt or something of that nature." L.P. also had two separate bruises near his left eye and "conjunctival hemorrhage," which is "bleeding in the white part of the eye which can result from minor trauma as well as being hit." L.P. had a mark on his left cheek, the size and shape of which indicated it might have been caused by a bite, and bruising on his arm, which was consistent with "finger marks from being grabbed."

{¶ 66} At the hospital, L.P. was given an acuity ranking of three on a scale of one to five. Dr. Pennington testified that this is an "intermediate range of acuity, meaning it's not life-threatening, but they should be seen within a reasonable time." L.P.'s final assessment was multiple linear abrasions and bruising "in different stages of development indicative of non-accidental trauma." Dr. Pennington explained that some of the bruising appeared brand-new and some of it was "days or longer older."

{¶ 67} L.P. and A.T.'s great-aunt, who now has custody of the children, testified that she saw them at the emergency room on March 18, 2010. L.P. had a black eye and what looked like belt marks across his stomach and his back. L.P.'s black eye lasted "a couple of weeks," and the bruising on L.P.'s back made it uncomfortable for him to lay down for "a little bit over a month." According to the great aunt, L.P. continues to have headaches and nightmares and is in counseling once a week.

{¶ 68} According to the children's maternal grandmother, who also testified at trial, "it took a while" for L.P.'s bruises to go away, and "[m]entally, he's really messed up."

{¶ 69} Defendant argues that the instant case is analogous to *State v. Snyder*, Cuyahoga App. No. 94755, 2011-Ohio-1062 and *State v. Ivey* (1994), 98 Ohio App.3d 249, 648 N.E.2d 519, in which this court found insufficient evidence of serious physical harm in relation to child abuse.   Upon review, however, we find that the facts of the case at hand are distinguishable in one substantial aspect:   *Snyder* and *Ivey* involved single incidents of corporal punishment, while the evidence in the instant case suggests that L.P. was the victim of recurrent abuse.

{¶ 70} Evidence in the record suggests that L.P. was whipped, hit, bit, and grabbed with enough force to leave lasting marks, some of which were located in and around his left eye.   Dr. Pennington testified that L.P.'s injuries were in various stages of development, suggesting that L.P. was abused on more than one occasion.   L.P.'s relatives testified that his bruises lingered, and the physical pain affected him for approximately one month after the injuries were inflicted.   Additionally, there is evidence that L.P. suffers from nightmares and headaches, for which he receives counseling.   L.P. was three and one-half years old when the abuse at issue occurred.

{¶ 71} We find that reasonable minds could have found that L.P. suffered serious physical harm as defined in R.C. 2901.01(A)(5)(a)-(e), in that he is undergoing counseling, he was incapacitated, he suffered temporary, serious disfigurement, and had chronic

bruises. A reasonable trier of fact could infer that this abuse would result in acute pain to a three-and-a-half-year-old child. Defendant's first assignment of error is overruled.

**{¶ 72}** Pursuant to App.R. 12(A)(1)(c), defendant's remaining assignments of error are made moot by our disposition of assignments of error three and four. Defendant's convictions are reversed and this case is remanded for a new trial.

**{¶ 73}** This cause is reversed and remanded to the lower court for further proceedings consistent with this opinion.

It is, therefore, considered that said appellant recover of said appellee his costs herein.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

JAMES J. SWEENEY, JUDGE

PATRICIA ANN BLACKMON, P.J., and
EILEEN A. GALLAGHER, J., CONCUR