[Cite as *State v. Goings*, 2012-Ohio-1793.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLANT,               CASE NO. 8-11-03

    v.

DOMINIC GOINGS,                     O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Logan County Common Pleas Court
Trial Court No. CR10-11-0200

**Judgment Affirmed**

**Date of Decision:   April 23, 2012**

APPEARANCES:

    *Gerald L. Heaton and Eric C. Stewart* for Appellant

    *Natalie J. Bahan*  for Appellee

**SHAW, P.J.**

{¶1} Although originally placed on our accelerated calendar, we elect, pursuant to Local Rule 12(5), to issue a full opinion in lieu of a judgment entry.

{¶2} Plaintiff-Appellant, State of Ohio, appeals from the judgment of the Court of Common Pleas of Logan County granting Defendant-Appellee's, Dominic Goings ("Goings"), motion in limine requesting suppression of an interview held between a child-victim ("K.S.") and a social worker with Logan County Children's Services. On appeal, the State contends that the trial court erred by suppressing the entire interview, as select portions of the interview contained nontestimonial statements made for purposes of medical diagnosis or treatment. Based on the following, we affirm the judgment of the trial court.

{¶3} On November 9, 2010, the Logan County Grand Jury indicted Goings on one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a felony of the third degree. The indictment arose from an alleged incident where Goings improperly touched the genital regions of K.S., a four-year-old girl. Later that month, Goings entered a plea of not guilty to the sole count in the indictment.

{¶4} In December 2010, Goings filed a motion in limine requesting suppression of the interview between K.S. and Erica James ("James"), a social worker with Logan County Children's Services. Specifically, Goings argued that

K.S.'s statements were testimonial in nature, were not made for purposes of medical diagnosis or treatment, and thus were inadmissible.

{¶5} In January 2011, the trial court held a hearing on Goings' motion in limine. During the hearing the State advised the trial court that it only sought admission of select portions of the interview between James and K.S., arguing that those portions contained statements made for purposes of medical diagnosis or treatment.

{¶6} James testified that she is a licensed social worker and is employed as an investigative specialist and intake worker with Logan County Children's Services ("Logan County Children's Services" or "Children's Services"). James' duties include reviewing reports submitted to Children's Services, reviewing the allegations therein, interviewing the parties involved, and determining whether the child is abused or neglected.

{¶7} James continued that K.S.'s case came to Children's Services attention via a phone call, in which the caller expressed concerns of possible sexual abuse. A report was drafted, accepted for review, and assigned to James. Following Children's Services protocol, James contacted K.S.'s family within twenty-four hours of receiving the report. Initially, James spoke with K.S.'s mother, Alisha, notifying her of the allegations, the individuals involved, and scheduled K.S. for an interview. James continued that she interviewed K.S. on August 6, 2010, at the

Children's Services facility. James, K.S., and Alisha were the only individuals present during the interview. James testified that the purpose of the interview was to determine the veracity of the allegations and whether the child required medical or emotional treatment. James further testified that cases involving sexual abuse of a child raise concerns of sexually transmitted diseases and vaginal tearing. James testified that if she determined that K.S. required medical or emotional treatment, that she would connect her and her family to the proper "community resources." Hearing Tr., p. 8.

{¶8} James continued that during the interview she presented K.S. with an anatomically correct drawing of a girl. K.S. labeled the vaginal region of the girl as a "private area." During the first half of the interview, James' twice asked K.S. whether anybody touched her "private area." Interview Tr., pp. 8, 12. Initially K.S. responded in the negative. After the second question, K.S. responded that her father touches her "private area" to clean it, but James determined after further questioning that nothing about these touches was inappropriate. James further testified that she was the first to interject Goings' name into her conversation with K.S., and repeatedly did so throughout the interview. See Interview Tr., pp. 2, 4-5, 18. At one point, James asked K.S. "I heard that [Goings] might have touched your private parts. Did that happen or did somebody else touch your private parts ever?" Interview Tr., pp. 18-19. K.S. acknowledged that Goings "accidently"

touched her "private area." *Id*. K.S. explained that Goings told her that there were crickets and lighting bugs inside her "private area." During this portion of the interview K.S. became distracted, asking whether she could leave the interview room. Interview Tr., p. 22. In response, James replied "In just a minute. * * * Because, you know, I've got to make sure that if kids' private parts get touched that they don't get hurt, okay? And so that's why I'm trying to ask you all these questions." *Id*. Thereafter, K.S. further described what Goings did to her "private area." After determining the extent of the touching, James' further inquired about the location of the incident and whether Goings was clothed during the incident. After K.S. answered these questions the interview came to an end.

{¶9} James continued that based on her interview with K.S. it was unclear whether Goings penetrated K.S.'s vagina. James testified that K.S. should be taken to a hospital, but that it was not an emergency to do so. Judgment Entry, pp. 3-4. Specifically James testified that "I told [K.S.'s parents that] if they wanted to take [K.S.] they could, but I didn't demand they take her for a physical exam either." Hearing Tr., p. 13. Additionally, it appears that K.S.'s parents had decided, of their own volition, to take K.S. to the emergency room, as evidenced by James' following testimony: "I didn't say that [K.S.] immediately needed to be taken. I told the parents - - we discussed it in the office about what [K.S.]

disclosed * * *, and they had decided to take her - - go ahead and take her to the emergency room to be examined." Hearing Tr., p. 10.

{¶10} K.S.'s parents informed James that they were going to take K.S. to Mary Rutan Hospital the next day, which they did. James testified that she did not convey K.S.'s interview or her findings to any medical professional, nor did she connect K.S. and her family with any counseling or treatment services immediately following the interview.

{¶11} James continued that if her investigation revealed any actions that may be criminal in nature, she is required to report the same to the police. As a result of her interview with K.S., James filed a report with the Logan County Sheriff's Department.

{¶12} In January 2011, the trial court filed its judgment entry granting Goings' motion in limine suppressing the entire interview.

{¶13} It is from this judgment that the State appeals, presenting the following assignment of error for our review.

### *Assignment of Error No. I*

**THE TRIAL COURT ERRED IN SUPPRESSING STATEMENTS MADE BY THE FOUR-YEAR-OLD VICTIM TO THE LOGAN COUNTY CHILDREN SERVICES SOCIAL WORKER WHICH WERE MADE IN PART FOR MEDICAL DIAGNOSIS AND TREATMENT.**

{¶14} In its sole assignment of error, the State contends that the trial court erred in suppressing select portions of the interview between K.S. and James. Specifically, the State contends that the selected statements were made for purposes of medical diagnosis or treatment, and thus were nontestimonial. We disagree.

{¶15} Initially, we note that the present appeal is being taken from a granting of a motion in limine. Upon denial or grant of a motion in limine there is ordinarily no error preserved for review and such a preliminary ruling standing alone is not a final appealable order. *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, ¶ 34-35. However, the Ohio Supreme Court has held that the State may appeal an evidentiary ruling that has the effect of excluding evidence as if it were a motion to suppress. *State v. Thieken*, 3d Dist. No. 9-2000-09 (June 29, 2000). The Ohio Supreme Court has explained that:

> **Any motion, however labeled, which, if granted, restricts the state in the presentation of certain evidence and, thereby, renders the state's proof with respect to the pending charge so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed, is, in effect, a motion to suppress. The granting of such a motion is a final order and may be appealed * * *.**

*State v. Davidson*, 17 Ohio St.3d 132, at syllabus (1985); Crim.R. 12(K). Here, the State has filed its certification pursuant to Crim.R. 12(K) that the trial court's ruling deprived the State of its ability to effectively prosecute Goings on the

offense of gross sexual imposition. Therefore, we will treat the pre-trial ruling as a ruling on a motion to suppress. *See Thieken*; *State v. Noble*, 9th Dist. No. 07CA009083, 2007-Ohio-7051, ¶ 7.

{¶16} "Appellate review of a decision on a motion to suppress evidence presents mixed questions of law and fact." *State v. Dudli*, 3d Dist. No. 3-05-13, 2006-Ohio-601, ¶ 12, citing *United States v. Martinez*, 949 F.2d 1117 (11th Cir. 1992). The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson*, 137 Ohio App.3d 847, 850 (12th Dist. 2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Id.*, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶17} The State contends that *State v. Arnold,* a relatively recent decision from the Ohio Supreme Court, is controlling in the present case. 126 Ohio St.3d 290, 2010-Ohio-2742. We agree. At the outset Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible unless an exception applies. Evid.R.

802. The parties in this case do not dispute that the statements which the State seeks to admit qualify as hearsay. Rather, the issue is whether the exception found in Evid.R. 803(4) applies.

{¶18} Under Evid.R. 803(4), even where a declarant is available to testify, a hearsay statement by that declarant is admissible if the statement was:

> **\* \* \* [M]ade *for purposes* of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment. (Emphasis added.)**

{¶19} Hearsay statements made to a social worker may be admissible *if* they are made for purposes of medical diagnosis or treatment. *See State v. Muttart,* 116 Ohio St.3d 5, 2007-Ohio-5267; *State v. Chappell*, 97 Ohio App.3d 515, 530-531 (8th Dist. 1994); *State v. Reigle,* 3d Dist. No. 5-2000-14 (Nov. 9, 2000).

{¶20} The trial court's consideration of the purpose of the child's statements will depend on the facts of the particular case. *Muttart* at ¶ 49. "At a minimum, \* \* \* a nonexhaustive list of considerations includes[:]" (1) whether the child was questioned in a leading or suggestive manner; (2) whether a motive to fabricate, such as a custody battle, existed; (3) whether the child understood the need to tell medical personnel the truth; (4) the child's age; and (5) the consistency

of the child's declarations. *Muttart* at ¶ 49; *State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, ¶ 7.

**{¶21}** In *Arnold*, the court analyzed whether admission of statements made to a social worker violate the Confrontation Clause where "the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Arnold* at ¶ 33. Thus, the court analyzed statements made to a social worker acting in a dual capacity: as an agent for the police and as an agent of medical personnel. *Id.*

**{¶22}** In *Arnold*, the court first examined the child-victim's statements that served primarily an investigative purpose. These statements included the child's assertion "that Arnold shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's 'pee-pee' looked like; and her statement that Arnold removed her underwear." *Id*. at ¶ 34. During this line of questioning, the court determined that the social worker was acting as an agent of the police because "[t]he primary purpose of that portion of the interview was not to meet an ongoing emergency but, rather, to further the state's forensic investigation. Thus these statements were testimonial in nature and their admission without a prior opportunity for

-10-

cross-examination is prohibited by the Confrontation Clause." *Id.* at ¶ 36, citing

*Crawford v. Washington,* 541 US 36. 68 (2004).

{¶23} Next, the court examined other statements the child-victim made during the same interview that were necessary for medical diagnosis. *Id*. at ¶ 37. The court determined that the child-victim's "statements that described the acts that Arnold performed, including that Arnold touched her 'pee-pee,' that Arnold's 'pee-pee' went inside her 'pee-pee,' that Arnold's 'pee-pee' touched her 'butt,' * * * were thus necessary for the proper medical diagnosis and treatment." *Id*. at ¶ 38.

{¶24} Ultimately *Arnold* concluded that statements in an interview at a child advocacy center by a social worker regarding "medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause." *Id*. at ¶ 44. However, "statements * * * that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial." *Id*. at ¶ 44.

{¶25} In directing courts to the proper application of *Arnold*, the Ohio Supreme Court held that a portion of any statement that has become testimonial should be redacted from the otherwise admissible evidence, reflecting the procedure for "unduly prejudicial portions of otherwise admissible evidence." *Id*. at ¶ 41. In sum, under *Arnold*, we must analyze whether any of the statements

made by K.S. to Erica James, the Social Worker, were for the purposes of medical diagnosis. If any of the statements were made for the purposes of medical diagnosis, they would be admissible under *Arnold* and therefore were improperly excluded.

{¶26} In determining the nature of separate sections of an interview, *Arnold* emphasizes that it is not the subjective understanding of the one being interviewed that is controlling, but what the circumstances objectively demonstrate i.e., "circumstances that would lead an objective witness to reasonably believe" the inquiry was testimonial or non-testimonial. *Arnold* at 294-296. On the other hand, based on the above, statements that do not relate to acts against the victim or statements that are not made to assist in an ongoing emergency are testimonial and would be inadmissible.

{¶27} In the case *sub judice* Erica James interviewed K.S. at Logan County Children's Services after K.S.'s mother reported a potential incident. James testified that her purpose in conducting the interview with K.S. was to find out if the allegations of sexual abuse were true or false and to try to figure out if K.S. would need any medical or emotional treatment. Hearing Tr. at 8. The interview was thus apparently intended to serve the dual capacity function contemplated in *Arnold*. *Arnold* at ¶ 33.

{¶28} The State claims that two separate parts of James' interview with K.S. were made for the purposes of medical diagnosis and were therefore nontestimonial and improperly excluded when the motion in limine was granted. The first segment of the interview that the State argues is nontestimonial is a set of preliminary questions where James asked K.S. to identify parts of a male and female body on dolls to establish K.S.'s familiarity with the human body. Interview Tr. p. 5-7.

{¶29} Though these statements might have been a prelude to medical diagnosis or treatment, they do not by themselves constitute statements for the purposes of medical diagnosis. These questions would not cause an objective person to believe they were for the purposes of medical diagnosis, as no questions were asked to K.S. at that time regarding any medical issues she was having. Furthermore, these questions do not call for answers which would describe acts that were done to K.S., nor were the questions asked in an attempt to assist in an ongoing emergency. Therefore we find these questions and answers were for the primary purpose of gathering forensic information, not for the purpose of medical diagnosis and treatment, and are therefore inadmissible.

{¶30} The second segment of the interview that the State argues qualifies as statements made for the purposes of medical diagnosis is where James begins to specifically ask K.S. about the alleged incident with Dominic. *See* Interview Tr.,

pp. 18-26. James brings Dominic's name back into the conversation and asks K.S. if Dominic ever touched her private parts. James then attempts to find out where and how Dominic touched K.S.'s private parts. As part of this questioning, K.S. often veers off topic with her answers. James, in an attempt to refocus K.S. after she expressed a desire to leave the interview room, explained to K.S. that "I've got to make sure that if kids' private parts get touched that they don't get hurt, okay?" Interview Tr., p. 22.

{¶31} Though this statement may arguably prompt a child to make statements for purposes of medical diagnosis or treatment, it did not in this case as K.S. responded that 'yes' she understood, then continued talking about lightning bugs. *Id.* We note that K.S. was only four years old and may have had difficulty grasping what she was being asked. However, when viewing the interview through an objective lens, we do not find that any excerpts of this segment of the interview rise to the level of questions for medical diagnosis. On the contrary, it seems clear that James was still acting in an investigatory capacity, attempting to ascertain exactly what happened.

{¶32} Moreover, throughout James' questioning of K.S. James collected no information that she forwarded to a medical facility. After the interview was complete, James testified that K.S. should be taken to a hospital, but that it was not an emergency to do so. Despite this recommendation, James conveyed no oral or

-14-

written report of her interview or findings to any medical professional even though she was aware, on the day of the interview, that K.S.'s parents were going to take K.S. to Mary Rutan Hospital for a medical exam. Furthermore, James did not testify to any working relationship with any qualified medical professional or that she was acquiring information for a qualified medical professional.

{¶33} James did, however, contact the police. As James took no steps to alert medical authorities but did alert the police, we find that under these circumstances she was acting as an agent of the police. Moreover, as there was no ongoing emergency the statements could not fall under those made for medical treatment or diagnosis as described in *Arnold*.

{¶34} For all of the foregoing reasons, nothing in the interview supports a conclusion that any part of the interview was directed to medical diagnosis or treatment of K.S. under the dual purpose doctrine of *Arnold*.

{¶35} Accordingly, we overrule the State's sole assignment of error.

{¶36} Having found no error prejudicial to the State herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**PRESTON, J., concurs.**

**/jlr**

-15-

**ROGERS, J., Concurring Separately.**

{¶37} While I concur in the result reached by the majority opinion, I write separately to emphasize other facts which support the majority's determination that none of K.S.'s statements during her interview with the social worker were made for purposes of medical diagnosis or treatment.

{¶38} First and foremost, I find it necessary to consider the status of the interviewer. By status I mean that person's relationship to medical and/or police personnel. Logically, if no relationship to medical personnel or facilities exists, then there is no exception to the hearsay rule available under Evid. R. 803(4).

{¶39} Here, the individual conducting the interview of K.S. is employed by a children's services agency and has as a principal duty to determine whether child protective services are warranted. If abuse is indicated, that person had a legal responsibility to report the suspected abuse to the appropriate police agency. She had no further responsibility or purpose. There was no pre-existing relationship with medical personnel, she had not been requested to make medical inquiries, the record does not disclose any medical training that would qualify her to make a medical diagnosis, and she, in fact, did not report any findings to any medical personnel despite having knowledge that K.S. would be taken to Mary Rutan Hospital the following day.

{¶40} Based on these findings alone, the necessary conclusion is that none of the statements from K.S. were made for the purpose of medical diagnosis and/or treatment, and no further discussion is required.

{¶41} The majority does properly rely on *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, but seems to ignore the underlying facts of the status of the individual conducting the interview in that case. That person was employed by a child-advocacy center and the acknowledged purpose of the interview was to glean both forensic and medical information. As described, both medical and law-enforcement personnel watch the interview from a separate room. The child is told that he or she will be examined by a doctor or nurse after the interview. The nurse or doctor doing the examination then "relies on information obtained during [the] interview to determine what examination and tests are needed." *Arnold*, at ¶ 31-32. Nothing in the current case approaches the circumstances that existed in *Arnold*.

{¶42} If one finds that further inquiry is necessary to determine the purpose of K.S.'s statements, I would also find that the environment in which the interview occurred would not have prompted a child like K.S. to make statements for purposes of medical diagnosis or treatment. The Supreme Court of Ohio has explained that "[o]nce the child is at the doctor's office, the probability of understanding the significance of the visit is heightened and the motivation for

diagnosis and treatment will normally be present." *State v. Dever*, 64 Ohio St.3d 401, 410 (1992); *see also State v. Kapp*, 3d Dist. No. 1-09-12, 2009-Ohio-5081, ¶ 20, *State v. Alkire*, 12th Dist. No. CA2008-09-023, 2009-Ohio-2813, ¶ 42 (the court noted the child's awareness of being in a medical setting), *State v. Azbell*, 4th Dist. No. 04CA11, 2005-Ohio-1704, ¶ 190. Where, however, the facts establish that the interview took place in a business office or some other non-medical setting, such an environment militates against a finding that the child's statements were made for purposes of medical diagnosis or treatment. *State v. Griffith*, 11th Dist. No. 2001-T-0136, 2003-Ohio-6980, ¶ 65 (finding that a child-victim's interview with a social worker in a room containing a love-seat, children's toys, and a table and chairs would not "notify the victim of any medical purpose for the pending interview"); *see also In re Corry M.*, 134 Ohio App.3d 274, 283 (11th Dist. 1999) (typically-dressed social worker carrying anatomically correct doll would not lead child to believe that she is speaking with the social worker for purposes of medical diagnosis or treatment).

{¶43} Here, the interview took place at Logan County Children's Services. There is no evidence that Logan County Children's Services is attached to or associated with a hospital, like the Child Advocacy Center in *Arnold*, or a quasi-medical facility such as a family practice. There is no evidence that the room in which the interview took place had the trappings of a doctor's office or medical

exam room.  Instead, the social worker testified that the interview took place in one of the agency's visitation rooms.  Lastly, there is no evidence that the social worker was dressed in a manner which would suggest to a child that she was speaking to someone who had a medical background or was in a location for the purpose of medical diagnosis or treatment.

{¶44} Accordingly, I agree with the majority's conclusion that none of K.S.'s statements were made for purposes of medical diagnosis or treatment.

/jlr